**James STEWART, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–1001–CR–48.**

Court of Appeals of Indiana.

April 18, 2011.

Matthew D. Anglemeyer, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

James Stewart ("Stewart") was convicted after a jury trial of seven counts of felony murder,[1] six counts of criminal confinement,[2] each as a Class B felony, one count of robbery[3] as a Class C felony, carrying a handgun without a license[4] as a Class A misdemeanor, and one count of burglary[5] as a Class B felony and was adjudicated an habitual offender.[6] The trial court sentenced Stewart to 425 years executed. He appeals, raising the following restated issues:

I. Whether Stewart's convictions for felony murder and robbery violated double jeopardy principles;

II. Whether the trial court abused its discretion when it admitted certain evidence and excluded other evidence under the rules of hearsay;

III. Whether Stewart's 425–year sentence violated equal protection considerations and was fundamentally unfair because it was the functional equivalent of life without parole and he did not receive the procedural safeguards and protections of the life without parole ("LWOP") statute;

IV. Whether the trial court abused its discretion when it admitted certain crime scene and autopsy photographs of the victims; and

V. Whether sufficient evidence was presented to support Stewart's convictions.

We vacate in part and affirm in part.

## FACTS AND PROCEDURAL HISTORY

On June 1, 2006, Emma Valdez ("Emma") and Alberto Covarrubvias, Sr. ("Alberto") lived at 560 North Hamilton Avenue ("560 North Hamilton") in Indianapolis, Indiana with their two young sons, eleven-year-old A.C. and eight-year-old D.C. Emma's adult son, Magno Albarran

---

1. *See* Ind.Code § 35–42–1–1(2).

2. *See* Ind.Code § 35–42–3–3.

3. *See* Ind.Code § 35–42–5–1.

4. *See* Ind.Code § 35–47–2–1.

5. *See* Ind.Code § 35–43–2–1.

6. *See* Ind.Code § 35–50–2–8.

("Magno"), lived in an upstairs apartment in the house. Emma's adult daughter, Flora Albarran ("Flora"), did not live in the house and was moving to a new residence on June 1, so her five-year-old son, L.A., was staying with Emma.

Stewart and Desmond Turner ("Turner") knew each other. In 2006, Turner, a black male, was approximately thirty years old, five feet nine inches tall, and weighed 145 pounds. Stewart, also a black male, was approximately thirty years old, five feet eleven inches tall, weighed 185 pounds, and was of a more muscular build than Turner. Stewart grew up in the Roosevelt/Tallman neighborhood and was living on Tallman Avenue in 2006. It takes five minutes or less to drive from the Roosevelt/Tallman neighborhood to the 500 block of North Hamilton.

Turner grew up on the 500 block of North Hamilton. He was friends with Aaron Swartz ("Swartz"), who also grew up on the 500 block of North Hamilton and still lived there in June 2006. In May 2006, Turner began coming back to the Hamilton Avenue neighborhood and visiting Swartz. In that time, several of the teenagers and kids in the neighborhood had met Turner and knew who he was. When Turner came to the neighborhood, he often drove a burgundy or red pickup truck that he borrowed from his girlfriend.

On the afternoon of June 1, 2006, several of the neighborhood kids were playing football in the street on North Hamilton when Turner drove up in the burgundy truck. Turner spoke to Brandon Griffith ("Griffith"), one of the teenagers, and left after approximately five minutes. Later that evening, around 8:30 p.m., Turner returned, still driving the burgundy truck, and stopped at Swartz's house briefly to

use the restroom. Turner and Griffith went to a nearby Speedway gas station to get a soda. When Turner dropped Griffith back off, Turner said he was "going to get my buddy, Lucky," and "my choppers"[7] and "I'll be back." Tr. at 3305. Turner also told Griffith that he was going to "hit a lick on the Mexicans down the street."[8] *Id.* at 3306. Turner got back into the burgundy truck and left alone. Griffith told the other neighborhood kids that "something was going to happen." *Id.* at 3047, 3105, 3131, 3259.

At approximately 9:45 p.m., Turner returned to Swartz's house with another black male, still driving the burgundy truck, and parked a short distance from the house. Turner walked up to the porch, had a brief conversation with Griffith and Swartz, and again went inside the house to use the restroom. While Turner was inside the house, the black male got out of the truck and walked towards the house. He was not wearing a shirt, was muscular and "stocky," and was a little bigger than Turner. *Id.* at 2774. This man asked the people on the porch to tell Turner to "hurry up." *Id.* at 3266. Turner returned to the truck, and the two men drove away with Turner in the driver's seat and the other man in the passenger seat. Griffith again went to tell the other neighborhood kids that something was going to happen. Based on the conversation he had with Turner, Swartz called his girlfriend into the house because he thought something was "getting ready to go on." *Id.* at 2777–78.

A few minutes later, several of the kids, who were on a porch across the street, saw Turner's truck in the alley behind 560 North Hamilton. They then saw two black men walk up the side of 560 North

---

**7.** "Choppers" is a term for an assault rifle. *Tr.* at 3306.

**8.** "Hit a lick" is an expression meaning to rob someone. *Id.*

Hamilton and onto the front porch. Turner was identified by several of the kids as being one of the men. The other man, who was a little bit taller, bigger, and more muscular than Turner and not wearing a shirt, was identified as being the same man who had been in Turner's truck in front of Swartz's house. That man had something red around his face, and Turner had a dark-colored mask around his face. Turner was carrying a long gun that looked like an AK–47, and the other man had a small handgun. The two men knocked on the door, and when it was opened, they forced their way into the house. The man with the red mask was seen through an upstairs window in the house and appeared to be putting items into a bag and tossing things around. A woman was seen through another window, and it appeared that she was on her knees with her hands behind her head and that there was a gun held to her head.

Magno arrived home, parked in the garage, and brought in the garbage cans. At around the same time, Flora arrived at the house; she left her car, still running with a female friend inside, double-parked in front of the house and went up to the door. After she knocked on the door, Flora was grabbed and pulled inside as she screamed, "No, not my child" and "my baby." *Id.* at 3062, 3211. Magno came around the corner and onto the porch carrying a bag of food; he set the food down, made a motion as if grabbing something at his side, and entered the house.[9]

Almost immediately, there was a single gunshot, followed by a large number of rapid gunshots that sounded louder and faster than the first. The two masked intruders ran out of the house and around to the alley. The man wearing the red mask was carrying either a trash bag or pillow case in his hands. A car started, and tires squealed. The neighbors then called 911.

Indianapolis Metropolitan Police Officer Michael Kermon received the dispatch of shots fired and was the first officer to arrive at the scene. He found a hysterical, crying Hispanic woman in the street pointing at 560 North Hamilton and saying, "they're shot." *Id.* at 2538. The front door of the house was open. When the officer entered the house, the air was still hazy and smelled of burnt gunpowder. The inside of the house was ransacked, and the lock to the upstairs apartment had been broken. Alberto's wallet was found on the ground outside of the house.

After the shootings, Magno, Alberto, Emma, Flora, A.C., D.C., and L.A. all lay dead from multiple gunshot wounds. Magno's body was lying in the living room, which was to the right of the entryway. A .357 revolver, which was loaded with five live rounds, was under his leg; a spent .357 casing was also recovered. Magno suffered multiple gunshot wounds, one of which was consistent with a .38 caliber weapon and the rest were consistent with a high velocity assault rifle. He also had bruising and abrasions to his face caused by blunt force impact, such as being struck with a fist or foot, and had a patterned abrasion on his neck consistent with the muzzle of a gun.

The bodies of Emma and Alberto were found in the dining room, and both had suffered multiple gunshot wounds. Both also had injuries consistent with being struck. Flora's body was discovered in the kitchen and had suffered multiple gunshot wounds. She also had bruises on her

9. Magno was known to always carry a gun, specifically a .357, for which he had a valid permit.

forearm, which were consistent with being grabbed near the time of her death. All three boys' bodies were found lying on a bed in a bedroom off of the kitchen. They had all suffered multiple gunshot wounds.

Joyce Snorten ("Snorten"), whose nickname was Big Hank, was a longtime friend of Stewart's. On the night of June 1, after Snorten had heard about the murders on television, Stewart came over to her house. He told her that he "got himself in some trouble" and that he "was at the wrong place at the wrong time." *State's Ex.* 336 at 45. Stewart told Snorten "just between them" that he was with Turner when Turner committed the murders by shooting people. *Id.* at 45–47, 73. He said that he begged Turner not to kill the kids, but Turner did it anyway and that the kids were lying face down on the bed. *Id.* at 74–75.

Shannon Winchester ("Winchester") had known Stewart since childhood, and they had been romantically involved from late 2004 through the spring of 2006, even though Winchester knew that Stewart was married to someone else and was having a romantic relationship with a third woman during this time. Around 11:30 p.m. on June 1, Stewart called Winchester, acting anxious and hyper. He asked her to come get him, but she refused because she was already in bed. Stewart called Winchester several more times that night between 1:00 and 7:00 a.m. He told her he was "in the neighborhood," which meant Roosevelt/Tallman, and asked her to come get him; Winchester could hear Snorten's voice in the background. On the morning of June 2, Stewart showed up at Winchester's house. He was pacing back and forth and saying, "I messed up, I messed up, it's over." *Tr.* at 4247. Stewart asked Winchester if she had seen the news about the "seven Mexicans" being killed, and she said no. *Id.* He told her that he and Turner had gone there to get drugs and money. *Id.* Stewart said that a "pretty Mexican girl" came to the door while they were there and he "snatched" her inside. *Id.* at 4249. He also said that he went upstairs to look for stuff, and when he came downstairs, a "Mexican" was pointing a gun at Turner, so Stewart started shooting. *Id.* Stewart told Winchester he had told Turner not to kill the kids. *Id.* Winchester spoke to the police that morning after Stewart had left. Stewart was arrested later that day, and a red shirt was found in the trunk of the car he was driving at the time he was arrested.

Michelle Clifton ("Clifton") had known Turner for several years and often allowed him to borrow her burgundy truck, which he was driving on June 1, 2006. Clifton saw Turner in the Roosevelt/Tallman neighborhood with her truck on the evening on June 1. When Clifton woke up on June 2, Turner was sleeping at the foot of her bed. A friend of Clifton's came to the house and told her that Turner was on television for murder; when Turner awoke and saw the televised reports of the murders, he began walking back and forth. Turner wanted Clifton and her friend to drive him to Kentucky, and they did, after first stopping in the Roosevelt/Tallman neighborhood at Turner's request. They reached Kentucky, and Turner wanted to continue to Alabama; but when he fell asleep, Clifton drove them back to Indianapolis. While Clifton was gone, the police conducted a search of her home and recovered several bullets, both .38 caliber and Wolf 7.62.39,[10] that did not belong to Clifton. Turner's clothes were also discov-

---

10. Wolf 7.62.39 ammunition is most commonly used in Russian SKS or AK–47 type assault rifles. *Tr.* at 4460.

ered soaking in the bathtub, with bottles of hydrogen peroxide and isopropyl alcohol lying nearby.

Eric Taylor ("Taylor"), who was a long-time friend of Stewart's and who also knew Turner, received a call from Turner sometime after the murders asking Taylor to meet him. When they met, Turner asked Taylor to find out where Stewart was. Turner told Taylor that Turner needed to deal with Stewart before the police did because Turner was afraid that Stewart was going to put the blame on him. *Id.* at 4119, 4120, 4132–33. Taylor was later incarcerated, and on August 29, 2007, Taylor and Stewart were transported back to the Marion County Jail together. No other inmates were present so Taylor asked Stewart what had happened regarding the murders. Stewart told Taylor that he was present at the crime, that he and Turner both had guns, and that Turner "put guns to the kids" and killed them. *Id.* at 4123.

Between June 2006 and August 2007, Stewart was held in cellblock 4–F at the Marion County Jail. Michael Litel ("Litel") was being housed in the same cellblock from July through December 2006 and was in the cell next to Stewart. Stewart told Litel that he and Turner had heard from kids in the neighborhood that there possibly was drugs and money in a safe at 560 North Hamilton. *Id.* at 4050. He told Litel it was only supposed to be a robbery with the take being split fifty-fifty. *Id.* at 4050–51. They tried unsuccessfully to recruit neighborhood kids to help with the robbery since the justice system would not be as hard on juveniles. *Id.* at 4051. Both Turner and Stewart were armed with guns, and Stewart said a girl had come to the door during the crime and he grabbed her and pulled her inside. Stewart was concerned about his fingerprints being on one of the guns because Turner had kept it as a threat in case Stewart ever told. *Id.*

at 4055. Stewart also told Litel that he had covered up with a red shirt that he left in the back seat or trunk of his car. *Id.* at 4057.

After his arrest, the State charged Stewart with seven counts of murder, seven counts of felony murder, seven counts of criminal confinement, each as a Class B felony, one count of robbery as a Class A felony, one count of burglary as a Class B felony, one count of carrying a handgun without a license as a Class C felony, and unlawful possession of a firearm by a serious violent felon as a Class B felony. The State also filed an information alleging Stewart to be an habitual offender. The first phase of the bifurcated jury trial was held from November 30, 2009 through December 11, 2009. On December 11, the jury found Stewart guilty of seven counts of murder, seven counts of felony murder, six counts of Class B felony criminal confinement, one count of Class A felony robbery, one count of Class B felony burglary, and one count of Class A misdemeanor carrying a handgun without a license. The jury found him not guilty of one count of criminal confinement, Count XVII, which involved Magno as the victim. The State dismissed the felony enhancement to the carrying a handgun without a license conviction and the unlawful possession of a firearm charge. Stewart waived his right to a jury trial as to his habitual offender allegation, and on January 6, 2010, the trial court found him to be an habitual offender. The State elected to have judgment of conviction entered on the felony murder convictions rather than the intentional murder convictions. The trial court also reduced the robbery conviction to a Class C felony with agreement of the parties to avoid double jeopardy problems. Stewart received an aggregate 425–year executed sentence. Stewart now appeals.

## DISCUSSION AND DECISION

### I. Double Jeopardy

■ The question whether multiple convictions violate the prohibition against double jeopardy is a question of law that is reviewed de novo. *Goldsberry v. State*, 821 N.E.2d 447, 458 (Ind.Ct.App.2005) (citing *Spears v. State*, 735 N.E.2d 1161, 1166 (Ind.2000)). Stewart argues, and the State concedes, that his convictions for both felony murder and robbery violated double jeopardy principles. In the present case, Stewart was convicted of the felony murder of Alberto with the underlying felony being robbery. He was also convicted of the robbery of Alberto. It is a violation of double jeopardy principles to convict and sentence a defendant for both felony murder and the underlying felony because the conviction for felony murder would necessarily require proof of the underlying felony. *West v. State*, 755 N.E.2d 173, 186–87 (Ind.2001); *Griffin v. State*, 717 N.E.2d 73, 80 (Ind.1999), *cert. denied* 530 U.S. 1247, 120 S.Ct. 2697, 147 L.Ed.2d 968 (2000); *Sanchez v. State*, 794 N.E.2d 488, 491 (Ind. Ct.App.2003), *trans. denied.*

Although the State agrees that Stewart's convictions for both felony murder and robbery cannot stand, it contends that the remedy for such an error is not to vacate the robbery conviction as Stewart urges, but instead to remand with instructions to vacate the felony murder conviction and enter judgment for the intentional murder of Alberto. In this case, Stewart was found guilty of seven counts of intentional murder and seven counts of felony murder, but judgment was only entered on the felony murder convictions. The State argues that the guilty verdicts for intentional murder still exist and are available for judgment to be entered upon them, citing to *Carter v. State*, 750 N.E.2d 778, 781 n. 9 (Ind.2001). That case, however, dealt with whether jury verdicts on which a trial court had not entered judgment must be vacated to avoid a double jeopardy violation, and the cited footnote states that it may not be prudent to vacate a jury verdict not reduced to judgment in order to avoid a double jeopardy issue. *Id.*

■ In this case, the trial court entered judgment of conviction on all seven counts of intentional murder and all seven counts of felony murder after the jury trial and then vacated the intentional murder convictions at sentencing. Therefore, *Carter* is inapposite to the present case because we are not dealing with whether mere jury verdicts constituted double jeopardy violations or whether such verdicts should be vacated. Further, at sentencing, the State elected to have the felony murder convictions stand and to have the intentional murder convictions vacated. Under the invited error doctrine, a party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct. *Boyd v. State*, 866 N.E.2d 855, 858 (Ind.Ct. App.2007) (citing *Wright v. State*, 828 N.E.2d 904, 907 (Ind.2005)) (quotations omitted). We therefore decline to remand to enter judgment of conviction for the intentional murder conviction. Because Stewart's convictions for both felony murder and the underlying felony of robbery violate the prohibitions against double jeopardy, we vacate the robbery conviction and the corresponding sentence of four years.

### II. Hearsay Evidence

The trial court has broad discretion in ruling on the admissibility of evidence. *Edwards v. State*, 930 N.E.2d 48, 50 (Ind. Ct.App.2010), *trans. denied.* We will reverse such a ruling only when the trial court abuses its discretion. *Id.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts

and circumstances before the trial court. *Boggs v. State*, 928 N.E.2d 855, 862 (Ind. Ct.App.2010), *trans. denied.*

Stewart argues that the trial court abused its discretion in the admissibility of several statements under the hearsay rules. He first contends that it was an abuse of discretion for the trial court to admit testimony by Taylor regarding the statement by Turner about finding Stewart after the murders because such testimony was inadmissible hearsay. He also claims that the trial court abused its discretion when it excluded two statements implicating "Lucky" as the second shooter because the statements were not hearsay.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible unless it falls within one of the exceptions provided by in the evidence rules. Evid. R. 802.

As to the admission of Taylor's testimony, Stewart specifically argues that the inculpatory statement that Turner wanted to find Stewart after the murders was inadmissible hearsay. Stewart asserts that the statement was used to prove the fact that Stewart was actually involved in the crime, which was a contested issue at trial. He contends that because the statement was admitted to prove the fact asserted in the statement, it was hearsay and should not have been admitted.

At trial, the State elicited testimony from Taylor that after the murders he received a phone call from Turner, who asked Taylor to meet him, which Taylor did. *Tr.* at 4117–18. Turner asked Taylor to find out where Stewart was. *Id.* at 4119–20. On redirect, Taylor further testified that Turner said he wanted to find Stewart so Turner could deal with him before the police found him because Tur-

ner was worried that Stewart would put all of the blame on him for the crimes. *Id.* at 4132–33. The trial court admitted this evidence over Stewart's hearsay objection and found that the testimony went to Turner's then existing state of mind. *Id.* at 4133.

Although hearsay is not admissible, it may be admissible if it falls under an exception contained in the rules. One exception is for a "statement of the declarant's then existing state of mind, ... (such as intent, plan, motive, design, mental feeling, pain and bodily health)...." Evid. R. 803(3); *Pelley v. State*, 901 N.E.2d 494, 504 (Ind.2009). Such statements may be admissible under this exception when the statements are offered to show the intent of the declarant to act in a particular way. *Camm v. State*, 908 N.E.2d 215, 226 (Ind. 2009); *Pelley*, 901 N.E.2d at 504. The exception applies to statements of any person to show his or her intent to act in a particular way and is not limited only to statements by victims of crimes. *Pelley*, 901 N.E.2d at 504 n. 5. Additionally, such declarations may be admitted not only as proof of the declarant's then existing state of mind, but also as circumstantial evidence of the declarant's future conduct. *Camm*, 908 N.E.2d at 226. However, the statement must go to the declarant's intent to act and cannot be a statement by the declarant about some other person's intent to act in the future. *Id.* at 226–27.

Here, the statements were offered to show Turner's then existing state of mind, specifically his intent to act in a particular way. Turner's statement was that he wanted to find Stewart to deal with him before the police found Stewart. In this statement, Turner was expressing his own intent to act in a particular way. Moreover, Turner's state of mind was relevant to a material issue at trial, specifically

the identity of his accomplice. Stewart did not dispute the extensive evidence, which showed that Turner was one of the two men who committed these crimes; instead, his defense was to challenge the strength of the evidence, which showed that he was the second man involved. Evidence that Turner was looking for Stewart shortly after the crimes because he wanted to deal with Stewart before the police found Stewart to prevent Stewart from putting the blame on Turner makes it more probable that Stewart was the second man involved in the crimes. *See* Evid. R. 401 (defining relevant evidence as "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Therefore, we conclude that the trial court properly admitted this evidence.

■ As to the excluded testimony referring to "Lucky," Stewart argues that two statements where Turner referred to "Lucky," and which implicated "Lucky" as the second shooter, should have not have been excluded as hearsay. He contends that the statement, to which Griffith attempted to testify, did not constitute hearsay because it was merely a command, and as such, was not hearsay. Stewart further claims that the statement, to which one of the neighborhood kids, J.L. attempted to testify, was also not hearsay because it was merely a question and contained no factual content. He therefore alleges that the trial court abused its discretion in excluding both statements because neither statement constituted hearsay.

At trial, Stewart attempted to admit testimony of Griffith regarding a conversation he overheard between Turner and the muscular black man who got out of Turner's truck at Swartz's house. Stewart argued that the statement, "Lucky, man, go back to the truck" was merely a com-

mand and not hearsay. *Tr.* at 3230. The trial court excluded the statement as hearsay. Stewart also tried to elicit testimony from J.L. that Griffith asked to borrow J.L.'s cell phone, turned to Turner and asked, "[w]hat's Lucky's phone number?," and that Turner recited a phone number that could not be called from J.L.'s phone due to a faulty keypad. *Id.* at 2817. The trial court excluded this statement as hearsay as well.

■ When an out-of-court statement is challenged as hearsay, we must first determine whether the testimony describes an out-of-court statement that asserts a fact susceptible of being true or false. *Lampitok v. State*, 817 N.E.2d 630, 639 (Ind.Ct. App.2004), *trans. denied* (2005). If the statement contains no such assertion, it cannot be hearsay and the objection should accordingly be overruled. *Id.* at 640. "However, if the statement does contain an assertion of fact, we consider the evidentiary purpose of the proffered statement; if it is to prove the fact asserted, and there are no applicable hearsay exceptions, the statement is inadmissible as hearsay." *Id.*

■ True requests, commands, and questions are not assertions, and evidence regarding such utterances may come in because they are not offered for the truth of the facts asserted. *Id.* (citing *Bustamante v. State*, 557 N.E.2d 1313, 1316 (Ind.1990)). This court has previously stated, "[w]hile we agree with this general principle, we do not agree that an assertion can never be found in a question or command." *Id.* The grammatical form of an utterance does not govern whether it is hearsay. *Id.* An utterance that is in the form of a question can in substance contain an assertion of a fact. *Carter v. State*, 766 N.E.2d 377, 382 (Ind.2002) (citing *Powell v. State*, 714 N.E.2d 624, 628 (Ind.1999)). "The classic example is 'Joe, why did you stab Bill?'" *Powell*, 714 N.E.2d at 628.

Such an utterance "clearly carries a factual allegation within it, and should be subject to cross-examination unless exempt for some other reason." *Id.*

Here, the clear purpose and the entire reason why Stewart wanted to have the statements admitted at trial, was not that Turner had commanded someone to get into his truck or that Griffith had asked for a phone number. Instead, it was the fact that the individual who he commanded to get back in the truck was named "Lucky" and that the phone number requested was for someone named "Lucky." Therefore, the relevant purpose of these statements was the fact that individual's name was "Lucky." Implicit in both the command and the question at issue was the factual assertion that the person with Turner or being contacted by Turner was "Lucky." Stewart was attempting to admit these statements to prove the truth of the matter asserted—that Turner's accomplice was named "Lucky" and could not have been Stewart because his nickname was not "Lucky." [11] Because we conclude that the statements were being offered for the truth of the matter asserted, namely the identity of the person referenced, they were hearsay and were properly excluded. The trial court did not abuse its discretion when it did so.

### III. Did Sentence Violate Equal Protection or Fundamental Fairness?

 Stewart argues that his term of years sentence totaling 425 years was effectively a sentence of life without parole as he will be confined to prison for the remainder of his life. Because he believes that his sentence is the functional equivalent of life without parole, he contends that he should have been sentenced under, Indiana Code section 35–50–2–9, the LWOP statute and should have been subject to the procedural protections and safeguards contained in that statute. Stewart asserts that, because he did not receive such benefits, his sentence violated equal protection and fundamental fairness concerns.

Initially, we note that Stewart is raising this claim for the first time on appeal. Arguments raised for the first time on appeal are waived. *Bryant v. State,* 802 N.E.2d 486, 496 (Ind.Ct.App.2004). At no time during his sentencing hearing or any time prior to the hearing, did Stewart ever raise an argument that the State was required to sentence him under the LWOP statute. Therefore, he has waived this argument on appeal.

Waiver notwithstanding, we choose to reach the merits of Stewart's argument. This court has previously addressed and rejected the contention that a defendant who either could potentially or actually does receive an effective life sentence is entitled to be sentenced under the LWOP statute. *See Wright v. State,* 916 N.E.2d 269, 279–80 (Ind.Ct.App.2009) (rejecting defendant's argument that term of years sentence for combination of several convictions was effectively life sentence, entitling him to protections of LWOP statute), *trans. denied* (2010); *Collins v. State,* 826 N.E.2d 671, 674 n. 8 (Ind.Ct.App.2005) (same), *trans. denied, cert. denied* 546 U.S. 1108, 126 S.Ct. 1058, 163 L.Ed.2d 885 (2006). Here, Stewart argues that he is being treated differently than other persons similarly situated who receive life sentences; he contends that some of these people are sentenced under the LWOP statute, with its special protections, while others, like him, are sentenced to a term of years functionally equivalent to life without parole without any of these protections.

11. Testimony at trial showed that Stewart's nickname was "Fonz." *Tr.* at 4112.

We conclude that Stewart is not similarly situated with defendants who are sentenced under the LWOP statute. Indiana Code section 35–50–2–9 authorizes the imposition of a life sentence without any possibility of parole for a single charge or conviction. *Wright,* 916 N.E.2d at 279–80; *Collins,* 826 N.E.2d at 674 n. 8. Stewart did not receive his 425–year sentence for a single charge or conviction; rather, he received the aggregate sentence based on individual sentences imposed for sixteen felony convictions, one misdemeanor conviction, and his habitual offender adjudication. Thus, it was the large number of serious felonies that Stewart committed that resulted in such a lengthy sentence and not the State's decision to request the trial court to sentence him to life based upon one single charge. Further, although Stewart's combined sentence may exceed his life span, "his sentence is nevertheless a term of years and does not officially foreclose the possibility of parole, however slight." *Wright,* 916 N.E.2d at 280.

Additionally, Stewart was not denied due process in any fashion in the way he was sentenced. He was represented by counsel and had the opportunity to present evidence on his behalf and argue mitigating factors to the trial court. Indeed, his counsel was free to argue the statutory mitigators contained in the LWOP statute. We conclude that Stewart was not entitled to the procedural protections of the LWOP statute, and we decline to remand for resentencing under such.

## IV. Admission of Photographs

 " 'Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion.' " *Schiro v. State,* 888 N.E.2d 828, 841 (Ind.Ct. App.2008) (quoting *Corbett v. State,* 764 N.E.2d 622, 626 (Ind.2002)), *trans. denied.* Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403. Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. *Schiro,* 888 N.E.2d at 841. Photographs that depict a victim's injuries are generally relevant and admissible. *Custis v. State,* 793 N.E.2d 1220, 1224 (Ind.Ct.App.2003), *trans. denied.* Although autopsy photographs are generally inadmissible if they show the body in an altered condition, they are admissible where some alteration of the body is necessary to demonstrate the testimony being given. *Id.* at 1225.

Stewart argues that the trial court abused its discretion when it allowed certain autopsy and crime scene photographs to be admitted into evidence at his trial. He contends that the reasons the trial court gave for admitting the photographs were irrelevant to any material issue in the case as he did not contest the victims' identities, the fact of death, the cause of death, the locations of the bodies at the crime scene, the location of any evidence, or any findings of the pathologist. Stewart further claims that, even if the photographs were relevant, they should have been excluded because any probative value was outweighed by unfair prejudice due to the gruesome and inflammatory nature of the photographs.

At trial, Stewart objected to the following photographic exhibits as being cumulative and/or gruesome and prejudicial: (1) State's Exhibits 276 and 280 regarding Magno; (2) State's Exhibits 171, 292, 293, 298, and 301 regarding Alberto; (3) State's Exhibits 174, 309, 313, 314, and 316 regarding L.A.; (4) State's Exhibit 217 regarding Flora; (5) State's Exhibits 173,

232, 233, and 237 regarding A.C.; and (6) State's Exhibits 175, 246, 256, and 257 regarding D.C. With respect to the two photographs of Magno, Stewart's objection was related to a rod inserted in the wounds to show the trajectory of the bullet. . Stewart also objected to four crime scene photographs: State's Exhibits 10, 81, 82, and 91.

■ A review of the exhibits at issue shows that they were not cumulative of each other. Each of the victims in this case suffered multiple gunshot wounds that, taken together, caused their deaths, and therefore, the large amount of photographs was a result of the large number of injuries suffered by the large number of victims in this case. Each of the photographs showed a different wound or a different angle of a wound that allowed the jury to observe the nature and location of the particular wound. The photographs were also all relevant because they depicted injuries suffered by the victims that caused their deaths. The exhibits were used by the pathologists during their testimony to show the injuries they were describing and what these injuries told them about how and when they were inflicted. *See Ward v. State*, 903 N.E.2d 946, 958–59 (Ind.2009) (finding no abuse of discretion in admission of multiple "gruesome" photographs of "gaping" wound of victim's abdomen because photographs depicted wound from different angles and were used by pathologist during testimony to describe nature of medical procedures performed and relevance of each photograph), *cert. denied* —— U.S. ——, 130 S.Ct. 2060, 176 L.Ed.2d 417 (2010).

The relevance of the photographs is not lessened because of Stewart's claim that he did not contest the victims' identities, the fact of their deaths, the nature of their wounds, or the causes of their deaths. Stewart was charged with the murder and

felony murder of each of the victims, and the State had to prove beyond a reasonable doubt that Stewart intentionally killed each victim and that he killed each of them in the course of committing robbery. The State was required to prove each element beyond a reasonable doubt even if Stewart was not contesting a particular element. Further, it is well-established that " 'the State is entitled to prove its case by evidence of its own choice, and that a criminal defendant may not stipulate his or her way out of the full evidentiary force of the case to be presented against him or her[.]' " *State v. Lewis*, 883 N.E.2d 847, 853 (Ind. Ct.App.2008) (quoting *Hines v. State*, 801 N.E.2d 634, 635 (Ind.2004)). Stewart could not prevent the jury from seeing the injuries inflicted on the victims by offering to stipulate to those injuries, and the State was entitled to present its full evidentiary case against Stewart.

■ The probative value of these photographs was not substantially outweighed by any unfair prejudice. The trial court recognized, and this court agrees, that the crime scene and autopsy photographs are difficult to view. However, the State could not show the jury what had occurred inside of 560 North Hamilton and prove its case beyond a reasonable doubt without presenting gruesome evidence because this was a gruesome crime. "Proving the nature and extent of a gruesome crime usually requires gruesome evidence." *Ward*, 903 N.E.2d at 959. Any prejudice arising out of the admission of these photographs was not unfair prejudice as the photographs merely accurately depicted the aftermath of the crimes in which Stewart participated. Further, although Stewart argues that these photographs inflamed the passions of the jury and caused them to want to make someone pay for the crimes, it is clear that the jury in this case was not so inflamed by passion

that it mindlessly convicted Stewart. The jury found him not guilty of one of the confinement charges, which demonstrated that it carefully applied the evidence to each count and objectively determined whether the State had proven each charge beyond a reasonable doubt.

■ Additionally, the two autopsy photographs of Magno were not unfairly prejudicial because of the presence of the rod in his wounds. When autopsy photographs show the body in an altered state, there is a concern that the photographs may "impute to the accused the handiwork of the pathologist and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy." *Custis,* 793 N.E.2d at 1225. Here, the pathologist clearly testified that he was the person who inserted the rods to show the trajectory of the bullet, and therefore, the photographs were admissible because this testimony served to mitigate the jury's drawing of an impermissible inference that Stewart was responsible for such alteration of the body.

We conclude that the challenged photographs were relevant, and that their probative value outweighed any potential prejudice. The trial court did not abuse its discretion by admitting these photographs into evidence at Stewart's trial.

### V. Sufficient Evidence

■ Our standard of review for sufficiency claims is well-settled. When we review a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Parahams v. State,* 908 N.E.2d 689, 691 (Ind.Ct.App.2009) (citing *Jones v. State,* 783 N.E.2d 1132, 1139 (Ind.2003)). We look only to the probative evidence supporting the judgment and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable

doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.* It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Yowler v. State,* 894 N.E.2d 1000, 1002 (Ind.Ct.App.2008).

Stewart argues that his convictions were not supported by sufficient evidence. He specifically contends that no eyewitnesses placed him at the crime scene and that no physical evidence linked him to the crime. He claims that the only evidence implicating him to the crimes was the testimony of four witnesses, Winchester, Snorten, Litel, and Taylor, who all testified that Stewart had confessed his involvement in the crimes to them. Stewart asserts that, for various reasons, all four of these witnesses' testimony was suspect, and therefore, the State presented insufficient evidence to support his convictions.

Stewart's argument does not contest that the State proved all of the required elements of all of the offenses beyond a reasonable doubt. He, instead, argues that the State failed to prove that he was the person who committed the crimes. Stewart's entire argument on appeal focuses on the credibility of the four witnesses who testified that he had confessed his participation in the crimes to them. This is merely a request for this court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *Parahams,* 908 N.E.2d at 691.

The evidence presented at trial showed that Stewart confessed his involvement as Turner's accomplice in the crimes at issue to four separate people. Several hours after the crimes occurred, Stewart told his long-time friend, Snorten, that he "got himself in some trouble" and that he "was at the wrong place at the wrong time."

*State's Ex.* 336 at 45. He told her that he was with Turner when the murders happened and that Turner had shot the victims. *Id.* at 73. The next morning, Stewart went to Winchester's house and began pacing back and forth and saying, "I messed up, I messed up, it's over." *Tr.* at 4247. Stewart asked Winchester if she had seen the news about the "seven Mexicans" being killed. *Id.* He told her that he and Turner had gone there to get drugs and money. *Id.* Stewart stated that a "pretty Mexican girl" came to the door while they were there, and he "snatched" her inside. *Id.* at 4249. He also said that he had gone upstairs to look for stuff, and when he came downstairs, a "Mexican" was pointing a gun at Turner, so Stewart started shooting. *Id.*

During his pretrial incarceration, Stewart was held in the same cellblock as Litel and told Litel that he and Turner had heard from kids in the neighborhood that there possibly was drugs and money in a safe at 560 North Hamilton. *Id.* at 4050. He told Litel it was only supposed to be a robbery with the take being split fifty-fifty. *Id.* at 4050–51. Both Turner and Stewart were armed with guns, and Stewart said a girl had come to the door during the crime and he grabbed her and pulled her inside. Stewart also told Litel that he had covered up with a red shirt that he left in the back seat or trunk of his car. *Id.* at 4057. Additionally, during his pretrial incarceration, Taylor and Stewart were transported back to the Marion County Jail together. Because no other inmates were present, Taylor asked Stewart what had happened regarding the murders. Stewart told Taylor that he was present at the crime, he and Turner both had guns, and Turner "put guns to the kids" and killed them. *Id.* at 4123.

The jury heard all of Stewart's argument regarding his belief that these witnesses' credibility was suspect and regarding the absence of physical evidence linking him to the crime scene. It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Yowler,* 894 N.E.2d at 1002. We therefore conclude that sufficient evidence was presented to support Stewart's convictions.

Vacated in part and affirmed in part.

CRONE, J., concurs.

BRADFORD, J., concurs in part and concurs in result in part with separate opinion.

BRADFORD, Judge, concurring in part and concurring in result in part.

Because I believe, absent invited error, that the trial court could enter judgment of conviction on the jury's verdict of guilty for Alberto's intentional murder in order to cure a double jeopardy violation, I must respectfully concur in result as to this issue only. In *Carter,* the Indiana Supreme Court stated that "[i]f a conviction for a greater offense is reversed for reasons specific to the incremental elements between the greater and a lesser included offense, a conviction for the lesser offense may remain valid." *Carter,* 750 N.E.2d at 781 n. 9. If a guilty verdict on which judgment of conviction has not been entered remains viable for one purpose, it remains viable for all purposes, including situations such as this one.

In all other respects, I concur with the majority opinion.