## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 23 2015, 6:30 am

*Kevin S Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jerome Seward,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 23, 2015

Court of Appeals Case No.
49A02-1408-CR-567

Appeal from the Marion Superior Court.
The Honorable Kurt Eisgruber, Judge.
Cause No. 49G01-1306-MR-38220

**Baker, Judge.**

[1] Jerome Seward appeals his convictions for Felony Murder,[1] a felony, Reckless Homicide,[2] a class C felony, and Robbery,[3] a class C felony. Seward argues that his convictions placed him in double jeopardy, that there is insufficient evidence supporting the felony murder conviction, that the prosecutor committed misconduct that amounted to fundamental error, and that the trial court abused its discretion in sentencing him. Finding that Seward's convictions placed him in double jeopardy and finding no other error, we affirm in part and remand with instructions to vacate the convictions and sentences for reckless homicide and robbery.

## Facts

[2] On June 7, 2013, Seward and Danielle Banks spent the evening at the residence of Bryce Barnes and Katelyn Mills. Over the course of the evening, Mills and Banks sat on the couch, talking, and Seward and Barnes gambled for money with dice. Seward had brought $180 with him, and the men were gambling for amounts between one and twenty dollars. Mills observed Barnes's behavior throughout the evening and concluded that he was "really excited and happy" and that the gambling was going well for him. Tr. p. 42.

---

[1] Ind. Code § 35-42-1-1.

[2] I.C. § 35-42-1-5.

[3] I.C. § 35-42-5-1.

[3] Seward and Banks left around 3:00 in the morning on June 8, 2013. At that time, Banks recalled that Barnes appeared to have been winning and was holding more money in his hands. After Seward and Banks left, Mills saw Barnes counting his money. She asked him if he was happy, and Barnes replied that he was.

[4] When Seward and Banks entered Seward's vehicle, he told Banks to call Mills and say that he had left his vodka bottle in the apartment. Banks made the call, and Mills said that Seward could return. When Seward came to the door of the apartment, he asked if he could use the restroom while he was there, and Mills gave him permission to do so.

[5] When Seward emerged from the bathroom, Barnes was sitting on the floor where he and Seward had played dice. Seward aimed a loaded .45-caliber semiautomatic pistol at Barnes's head and said, "you know what this is. Give me your money, or give me 'my money'." *Id.* at 47. Seward grabbed Mills, struck her with the gun in the head, and placed her in a chokehold, saying to Barnes, "if you love your lady . . . you better give me the money." *Id.* at 48. At that point, Barnes and Mills both struggled with Seward over the gun. Mills ran to the apartment's balcony door, opened it, and screamed for help. At that point, she heard a gunshot, saw Barnes fall, and watched Seward run out of the apartment. Mills called the police.

[6] Seward returned to the car and Banks noticed that he was shaken up and looked disheveled. He removed a handgun from his pocket, lifted up his shirt,

and placed the handgun in a holster. Seward told Banks that Mills and Barnes had tried to rob him.

[7] Seward drove Banks to her apartment and left. She called Mills to ask what had happened, and Mills told her that Seward had shot Barnes. When police officers and emergency medical responders arrived at Mills's residence, they attempted to resuscitate Barnes but were unsuccessful and pronounced him dead at the scene. The only currency that officers found in or around the residence was a torn piece of currency on the floor, twenty-one dollars concealed in one of Barnes's socks, and two crumpled twenty-dollar bills in the parking lot outside the apartment.

[8] Seward evaded law enforcement for several days, during which he went to South Bend, disassembled his handgun into several pieces, and disposed of the pieces in different dumpsters or trash cans. Eventually, Seward turned himself over to law enforcement.

[9] On June 11, 2013, the State charged Seward with murder, felony murder, class A felony robbery, class A misdemeanor battery, and carrying a handgun without a license. The State also sought a twofold sentence enhancement based on the following allegations: (1) Seward had used a firearm in the commission of a felony that resulted in death, and (2) the carrying a handgun without a license charge was a C felony because Seward had a prior conviction for the same offense.

[10]  Seward's two-day jury trial took place on June 30 and July 1, 2014. Seward testified that when he emerged from the bathroom, Mills and Barnes attacked and tried to rob him of money that he had won earlier in the evening.

[11]  During closing argument, Seward's attorney attempted to undercut Mills's testimony, saying that it sounded "like somebody just trying to fill in some blanks with stock footage from a bad action movie" and asking, "Do real people behave like that? Give me the money or, you know, if you want your lady back, and suddenly, you know, the money gets thrown up in your face and there's probably a clever pun made at that point in the movie." Tr. p. 273.

[12]  During rebuttal, the prosecutor stated, "if you want a line from a bad 80s or 90s movie, I've got one for you: Show me the money. Show me the money. If what [Seward] told you up there on the stand is true, then show me the money." *Id.* at 288. Seward's attorney stated, "Judge, that implies a burden shift," but did not object or request an admonishment or other relief. *Id.* The prosecutor continued, "Why is [the money] not there? Because he stole it." *Id.* The prosecutor then observed that if Seward had been telling the truth when he stated that Mills and Barnes had attacked and robbed him, there would have been money in the apartment, "But that's not what happened, and that's why you can't show me the money, because it's somewhere between here and South Bend, scattered like the rest of the pieces of the gun that [Seward] got rid of." *Id.* at 292-93.

[13]     The jury found Seward not guilty of murder, but guilty of the lesser-included offense of reckless homicide, guilty of felony murder, guilty of robbery, not guilty of battery, and guilty of carrying a handgun without a license. The State dismissed the enhancement based on Seward's prior conviction for carrying a handgun without a license, and the trial court found that the enhancement based on using a firearm in the commission of a felony resulting in death applied.[4]

[14]     Seward's sentencing hearing took place on July 23, 2014. At the sentencing hearing, Barnes's father testified. He spoke about the loss of his son, the community problems of crime and recidivism, the anger he felt towards Seward. He also spoke about two incidents that had occurred during the legal proceedings. First, he testified that someone in the courtroom had fondled "one of the victim[']s buttocks" during a pretrial hearing; second, he testified that during the trial, another individual approached him and said, "I'm gonna smoke you, pow-pow-pow-pow." Tr. p. 320. The trial court permitted Barnes to testify on those topics over Seward's objection, but noted that it would give the testimony "appropriate weight" and did not reference the uncharged conduct of Seward's associates as an aggravating factor. *Id.* at 319.

[15]     At the close of the sentencing hearing, the trial court sentenced Seward to fifty-six years for felony murder, which was enhanced by five years for Seward's use

---

[4] Seward had waived his right to a jury trial with respect to the sentence enhancement.

of a handgun, to be served consecutively to Seward's one-year sentence for carrying a handgun without a license.[5]  The trial court suspended one year of the sentence to house arrest.  The trial court stated that the reckless homicide and robbery convictions merged into the felony murder conviction, but the abstract of judgment shows the entry of convictions and concurrent four-year terms for reckless homicide and robbery.  Seward now appeals.

# Discussion and Decision

## I.  Double Jeopardy

[16]  We first address Seward's arguments that his convictions for felony murder, reckless homicide, and robbery place him in double jeopardy for the same offense, amounting to a violation of his state constitutional rights.  The State concedes this issue, and we agree.

[17]  Although the trial court merged the counts, we note that "[a] trial court's act of merging, without also vacating the conviction, is not sufficient to cure a double jeopardy violation."  *Gregory v. State*, 885 N.E.2d 697, 703 (Ind. Ct. App. 2008).  A double jeopardy violation is not remedied by the "practical effect" of concurrent sentences or merger of convictions.  *Id.*

[18]  In this case, the same actual evidence was used to convict Seward of felony murder, reckless homicide, and robbery, meaning that these convictions placed

---

[5] Seward does not appeal his conviction or sentence for carrying a handgun without a license.

Seward in double jeopardy, in contravention of Article 1, Section 14 of the Indiana Constitution. *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999); *see also Shields v. State*, 493 N.E.2d 460, 460 (Ind. 1986) (holding that "one may not be twice punished for a single homicide"); *Stewart v. State*, 945 N.E.2d 1277, 1285 (Ind. Ct. App. 2011) (holding that "[i]t is a violation of double jeopardy principles to convict and sentence a defendant for both felony murder and the underlying felony"). Consequently, we remand with instructions to vacate Seward's convictions and sentences for reckless homicide and robbery.

## II. Prosecutorial Misconduct

[19] Next, Seward contends that the prosecutor committed misconduct that amounts to fundamental error. In reviewing a claim of prosecutorial misconduct, we determine first, whether misconduct occurred, and second, whether the misconduct placed the defendant in a position of grave peril to which he would not have been otherwise subjected. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). When the allegations of misconduct arise from a prosecutor's argument, it has been established that "[w]hether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). "To preserve a claim of prosecutorial misconduct, the defendant must— at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Ryan*, 9 N.E.3d at 667.

[20] Where, as here, the claim of prosecutorial misconduct has been procedurally defaulted by failing to properly raise the issue in the trial court, the defendant must also establish that the prosecutorial misconduct constituted fundamental error. *Id.* at 667-68. Fundamental error is "an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Id.* at 668 (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). As our Supreme Court has cautioned, "[f]undamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial court errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.* at 668.

[21] Here, Seward contends that when the prosecutor weaved a theme of "show me the money" throughout the closing argument and rebuttal, the State impermissibly implied to the jury that the burden of proof had shifted to Seward. We disagree. It is apparent that the prosecutor was highlighting the absence of money found in Barnes's apartment, which is both circumstantial evidence of Seward's robbery, as explained below, and evidence that directly contradicts Seward's testimony that Barnes and Mills had robbed him. The prosecutor was not implying that it was Seward's job to "show" the money; instead, he was merely emphasizing the absence of that money to the jury, which he was entitled to do to prove the State's case. And the use of a quotation from a movie was merely a creative response to defense counsel's

comparison of Mills's testimony to a bad action movie. We see no prosecutorial misconduct in this situation, let alone misconduct that amounts to fundamental error. Consequently, we decline to reverse on this basis.

## III. Sufficiency of the Evidence

[22] Next, Seward argues that there is insufficient evidence supporting his felony murder conviction. When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor assess witness credibility. *McClellan v. State*, 13 N.E.3d 546, 548 (Ind. Ct. App. 2014), *trans. denied*. Instead, we consider only the probative evidence supporting the conviction and the reasonable inferences to be drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable factfinder could have drawn the conclusion that the defendant was guilty beyond a reasonable doubt, then the verdict will not be disturbed. *Id.*

[23] To convict Seward of felony murder, the State was required to prove beyond a reasonable doubt that he killed Barnes while committing a robbery. I.C. § 35-42-1-1(2). Robbery is the knowing or intentional taking of property from another person by using or threatening the use of force on any person or by putting any person in fear. I.C. § 35-42-5-1.

[24] In this case, Mills testified that during the game, she interpreted Barnes's behavior to mean that the gambling was going well for him. Tr. p. 42-43. She also testified that after Seward and Banks left, she observed Barnes counting his money, and that he said he was happy. *Id.* at 46. Banks corroborated Mills's

testimony, stating that when she and Seward left the apartment, Barnes appeared to have been winning and was holding more money in his hands. *Id.* at 103, 106-07.

[25] Mills testified that when Seward emerged from the bathroom, he aimed a loaded firearm at Barnes's head and demanded that Barnes give him the money. *Id.* at 46. Seward then struck Mills in the head with the firearm and threatened Barnes, "if you love your lady . . . you better give me the money." *Id.* at 48. Eventually, Seward shot and killed Barnes and fled the scene. *Id.* at 49. When police investigated the scene of the crime, the only money they found was a torn bill inside the apartment and two crumpled twenty-dollar bills in the parking lot. *Id.* at 161-62.

[26] This evidence is sufficient to prove that Seward used force on Mills and Barnes, threatened to use force on Mills and Barnes, and placed Mills and Barnes in fear. The circumstantial evidence of the absence of money in the apartment could establish for a reasonable juror that Seward took Barnes's money after he shot Barnes. In sum, the evidence is sufficient to prove beyond a reasonable doubt that Seward committed robbery and killed Barnes in the process. Seward's arguments to the contrary, in which he points out inconsistencies in testimony, amount to a request that we reweigh evidence and assess witness credibility—a request we decline. We find sufficient evidence supporting Seward's felony murder conviction.

# IV. Sentencing

[27] Finally, Seward argues that the trial court abused its discretion by permitting Barnes's father to testify at the sentencing hearing regarding two incidents that occurred during the legal proceedings and that were not committed by Seward but instead by two of his associates.

[28] Initially, we note that Seward acknowledges that the trial court did not rely on Barnes's father's testimony as an aggravating factor. Similarly, Seward does not argue that Barnes's father did not have the right to testify. *See* Ind. Code § 35-35-3-5 (giving victims the right to speak at a sentencing hearing); Ind. Code §35-31.5-2-348(a) (defining "victim" as "a person who has suffered harm as a result of a crime").

[29] Instead, all that Seward argues is that the trial court abused its discretion by permitting Barnes's father to testify regarding the two incidents in question. Seward offers no authority to support this proposition, and indeed, we can find none.

[30] We presume that in a proceeding tried to the bench, which includes sentencing hearings, the trial court renders its decisions solely on the basis of relevant and probative evidence. *Hinesley v. State*, 999 N.E.2d 975, 987 (Ind. Ct. App. 2013), *trans. denied*; *Coleman v. State*, 558 N.E.2d 1059, 1062 (Ind. 1990). In this case, Barnes's father testified at the sentencing hearing, as he was entitled to do. In addressing Seward's objection to the testimony, the trial court noted that it would give the testimony appropriate weight. And in imposing the sentence on

Seward, the trial court did not include the two incidents for which Seward was not responsible—nor, indeed, did it include any portion of Barnes's father's testimony—in its list of aggravating factors. We presume that the trial court rendered its decision solely on the basis of the relevant evidence before it, and see no reason in the record before us to part ways with that presumption in this case. We find that the trial court did not abuse its discretion by permitting Barnes's father to testify at the sentencing hearing.

[31] The judgment of the trial court is affirmed in part and remanded with instructions to vacate the convictions and sentences for reckless homicide and robbery.

Friedlander, J., and Crone, J., concur.