**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**RYAN D. BOWER**
Salem, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

FILED
May 07 2014, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT F. PETTY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 72A05-1305-CR-237 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE SCOTT CIRCUIT COURT
The Honorable Frank Newkirk, Special Judge
Cause No. 72C01-1009-MR-1

**May 7, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Robert Petty (Petty), appeals his conviction for Count I, voluntary manslaughter, Ind. Code § 35-42-1-3; Count II, removal of body from scene, a Class D felony, I.C. § 36-2-14-17; and Count III, obstruction of justice, a Class D felony, I.C. § 35-44-3-4.

We affirm.

## ISSUES

Petty raises four issues on appeal which we restate as follows:

(1) Whether trial court abused its discretion in admitting several autopsy photographs;

(2) Whether the trial court failed to tender the proper jury instructions;

(3) Whether there was sufficient evidence to prove beyond a reasonable doubt Petty's conviction of voluntary manslaughter; and

(4) Whether Petty's sentence is inappropriate.

## FACTS AND PROCEDURAL HISTORY

On April 7, 2007, Petty married Nina Keown (Keown), and welcomed their daughter, B.P., a month later. On October 9, 2009, Petty and Keown divorced, but got back together in July 2010. Keown was also in the process of moving back into Petty's house located on 7168 East Plymouth Road, Lexington, Indiana.

On August 7, 2010, Petty, Keown, and B.P drove to Clarksville, Indiana for a day of shopping. Petty bought a video game at a game store, two pints of Jim Beam at a liquor

2

store, and a ring for Keown at a pawn shop. They drove back to Lexington arriving around 4.30 p.m., dropped off B.P at Petty's fathers' house, and drove to Scottsburg, Indiana to attend the HopStock Music Festival (concert). Petty and Keown were together at the beginning of the concert but later separated. At some point, Petty wanted to go home. He walked back to his Camo 4-Wheeler (4-Wheeler) only to find Keown standing next to it, talking to somebody on her cellphone. Keown quickly hung up, and when Petty asked who she was talking to, Keown replied, "none of your fucking business." (Transcript p. 1488). This made Petty angry and they started to argue. They were both intoxicated from the alcohol they had consumed at the concert. The pair set off in the 4-Wheeler but stopped at the intersection of Plymouth Road and Highway 3, where they got out and continued arguing for about two to three minutes before climbing back into the 4-Wheeler and driving the rest of the way home. Once they arrived at Petty's residence, Petty snatched Keown's cellphone. Using her call history, Petty called the last number Keown had dialed. It turned out that Keown had called a wrong number, and had spoken to a man by the name of Joe Barger (Barger). Barger told Petty that Keown had called him three times asking for "Mitch." (Tr. p. 1456). Petty called Barger approximately ten times but Barger refused to talk to him or disclose his identity. In one of these ten phone calls, Petty threatened Barger and told him that he would go over to his house to "whip" and "kill" him. (Tr. p. 1462).

In the meantime, Keown had gone to the master bedroom and had passed out on the bed, with her feet hanging over the foot of the bed. Since Petty did not get any information from Barger, he went into the master bedroom to ask Keown the same question. Keown

3

was unconscious and could therefore not answer him back. At this point, Petty was "mad at her," he got on top of Keown, put his hands on her throat and choked her. (Tr. p. 1575).

When Petty saw that Keown was not responding, Petty left the house and drove back to Scottsburg, Indiana, stopping at Wal-Mart and Burger King. Approximately one hour later, Petty drove back to his house and found Keown still unconscious and she had turned blue. Petty tried to resuscitate Keown but she did not wake up. According to Petty, he knew Keown had died because she had urinated on herself. Petty decided that he did not want to go to jail, so he tried "to [] make it all disappear." (Tr. p. 1527). Petty placed Keown's body and her boots into the back of his 4-Wheeler, and drove out into the countryside stopping near Saluda, Indiana. He then placed two phone calls from Keown's cellphone in an attempt to divert suspicion from himself. After that, Petty removed Keown's cellphone battery, and threw it into the field. Petty decided not to dump Keown's body there, so he drove further down, stopping at Bethlehem Road in New Washington, Indiana. The road was on hill and was overlooking a heavily wooded area. Petty picked up Keown's body, stepped over the guardrail, and began carrying her body down the hill and into the woods. The hill was quite steep and Petty quickly fell, dropping Keown's body. Petty left Keown's body where it came to rest. He then drove for a while only to realize that Keown's boots were still on the floorboard of his 4-Wheeler; he stopped and pitched the boots over the guardrail. At some point, he also realized that he still had Keown's ring in his pocket, so he also pitched it somewhere along that route.

The next morning, he returned to the site where he had dumped Keown's body to retrieve her clothes, because Petty feared, if found, it might assist the police in identifying

4

him as Keown's killer. He then drove back home, and burned Keown's clothes alongside his bed clothes in his backyard. On the same day, Petty called Keown's mother and grandmother and asked whether they had seen or heard from Keown. Petty told them that he and Keown had argued at the concert the night before, and the last time he had seen her was when she walked away at the intersection of Plymouth Road and Highway 3. Petty would continue to tell the same story to the police for about three weeks.

On August 26, 2010, while Petty was in custody for an unrelated case in Clark County Jail, Petty asked to speak to the sheriff but he was not available. Petty spoke to Deputy Sherriff, Racheal Lee (Deputy Lee), and he confessed to killing Keown and he offered to aid the officers in Scott County with Keown's investigation. Thereafter, Deputy Lee called Scott County Sherriff Department, and arranged to meet officers near the site where Petty had dumped Keown's body. Keown's skeletal body was found the next day.

On September 29, 2010, the State filed an Information charging Petty with Count I, murder, I.C. § 35-42-1-1; Count II, removal of body from scene, a Class D felony, I.C. § 36-2-14-17; and Count III, obstruction of justice, a Class D felony, I.C. § 35-44-3-4. That same day, the State amended the Information adding a fourth charge, Count IV, habitual offender, I.C. § 35-50-2-8.

Petty's jury trial was conducted on January 29, 2013 through February 13, 2013. Toward the end of the trial, Petty tendered jury instructions on involuntary manslaughter. The trial court denied his request and only instructed the jury on voluntary manslaughter as the lesser-included offense of murder. At the close of the hearing, the jury returned a guilty verdict of voluntary manslaughter, removal of body from scene, and obstruction of

5

justice. Following the return of a guilty verdict on all Counts, Petty admitted to the habitual offender charge.

On April 17, 2013, the trial court held Petty's sentencing hearing. In the end, the trial court sentenced Petty to consecutive sentences of: twenty years on voluntary manslaughter, enhanced by thirty years due to his habitual offender status; three years for removal of body from scene; and three years for obstruction of justice. Thus, Petty's aggregate sentence was fifty-six years.

Petty now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Admission of Photographs*

"Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this court reviews the admission of photographic evidence only for abuse of discretion." *Schiro v. State*, 888 N.E.2d 828, 841 (Ind. Ct. App. 2008) (quoting *Corbett v. State*, 764 N.E.2d 622, 626 (Ind. 2002)), *trans. denied*. Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403. Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. *Schiro*, 888 N.E.2d at 841. Photographs that depict a victim's injuries are generally relevant and admissible. *Custis v. State*, 793 N.E.2d 1220, 1224 (Ind. Ct. App. 2003), *trans. denied*.

Petty argues that the trial court erred in admitting Exhibit "19[A-C], and 20A-L and others." (Appellant's Br. p. 3). He argues that the admission of these exhibits was not

6

relevant to the issues at trial, because there was no dispute about the identity of Keown or that she had been killed. Petty therefore contends that the admission of the photographs was substantially prejudicial and constituted a fundamental error.

In this case, Petty recognizes that he did not object to the admission of these photographs at trial. "Failure to object to the admission of evidence at trial normally results in wavier and precludes appellate review unless its admission constitutes fundamental error." We will find fundamental error only when there has been a " 'blatant violation of basic principles' that denies a defendant 'fundamental due process.' " *Goodwin v. State*, 783 N .E.2d 686, 687 (Ind. 2003) (quoting *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987)). The "error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Wiley v. State*, 712 N.E.2d 434, 444–45 (Ind. 1999).

Looking at the record, we find that the trial court's admission of the said exhibits did not constitute a fundamental error. Exhibit 19A-C, and 20A, were photographs of Keown's skeletal remains. Since the remains were in a body bag, the pathologist explained that the photographs were taken when he and his team were assembling the skeleton, and positioning the bones in order.

Exhibit 20B, depicted two clavicles, one of which was longer than the other. The pathologist explained that fractures associated with the skeletal remains were useful in identifying a person, if they are at all listed in a person's medical history. The pathologist explained that one of the clavicles retrieved at the site was thicker in the middle because it healed from a fracture. Later at trial, Keown's mother testified that Keown broke her collarbone in "4-wheeler accident" about "a year or two" ago. (Tr. p. 1445)

7

Exhibit 20C and D, displayed photograph of Keown's upper and lower jaw with several teeth missing. The pathologist further explained that the dental records of a person were also useful to identify a person. Later at trial, the forensic dentist, testified that these two exhibits were used to positively identify Keown. He concluded that when he compared the post-mortem x-ray dental records, and the ante-mortem x-ray dental records, there was a match. Keown had previously extracted some teeth, she had fillings on some of her teeth, and she had also had a root canal conducted on one of her teeth. *See*, C*atrabone v State,* 490 N.E. 2d 272, 273 (1986) (where identification of the skeletal remains was made through dental records).

Exhibit 20E-L, depicting Keown's fractured ribs and skull were also introduced. The pathologist explained that the objective was to look for evidence of trauma. He stated that the fractures identified on the ribs had occured prior to her death, and were not associated with her death. He also explained that there was no trauma on her skull. Even though the admission of Exhibit 20E-L had no probative value of establishing Keown's cause of death, we find the admission of the exhibits was a harmless error. We note that "[e]rrors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

Overall, Petty has not demonstrated how the admission of the photographs affected his substantial rights. It is undisputed that Petty killed Keown, threw her body into the woods, and waited three weeks before telling anyone. By the time the police recovered Keown's body, it had decomposed and they could only retrieve her skeleton. Moreover,

we find that the photographs at issue here were admitted in conjunction with expert testimonies to explain Keown's identity and possibly identify her cause of death. We are not persuaded that the photographs at issue were prejudicial as to influence the jury improperly. We therefore conclude the court did not abuse its discretion in admitting the photographs.

## II. *Jury Instructions*

Petty argues that the trial court abused its discretion when it denied his proposed jury instruction offering involuntary manslaughter as a lesser included offense to the murder charge. He contends that his request should have been granted because involuntary manslaughter is a factually included lesser offense of murder and there was a serious evidentiary dispute as to whether Petty intended to kill or merely batter Keown.

The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review only for an abuse of that discretion. *Emerson v. State,* 724 N.E.2d 605, 608 (Ind. 2000); *Stringer v. State*, 853 N.E.2d 543, 548 (Ind. Ct. App. 2006). An abuse of the trial court's discretion occurs "when 'the instructions as a whole mislead the jury as to the law in the case.' " *Ham v. State*, 826 N.E.2d 640, 641 (Ind. 2005) (quoting *Carter v. State,* 766 N.E.2d 377, 382 (Ind. 2002)). A defendant is only entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights. *Hero v. State,* 765 N.E.2d 599, 602 (Ind. Ct. App. 2002), *trans. denied.*

A trial court must engage in a three-step analysis when determining whether to instruct a jury on a lesser included offense of the crime charged. *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995). First, the trial court must consider whether the alleged

9

lesser included offense is an inherently included offense to the principal charge. *Id.* If it is not, the trial court must then decide whether the alleged lesser included offense is a factually included offense to the principal charge. *Id.* at 567. Finally, if the alleged lesser included offense is either an inherently or factually included offense to the principal charge, then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge. *Id.* If such a dispute is present and a jury could conclude that the lesser offense was committed but not the principal charge, then it is a reversible error for the trial court to refuse to give the jury instructions on the lesser included offense. *Id.*

Murder is defined as "knowingly or intentionally" killing another human being. Ind. Code § 35-42-1-1(1). Involuntary manslaughter is the killing of a human being while "committing or attempting to commit . . . battery." I.C. § 35-42-1-4(c)(3). The trial court's refusal to instruct the jury on the lesser included offense would have been an abuse of discretion only if there was a serious evidentiary dispute as to whether Petty's intent was to kill or merely batter Keown. *See Ketcham v. State,* 780 N.E.2d 1171, 1178 (Ind. Ct. App. 2003), *trans. denied.*

It is undisputed that involuntary manslaughter is not an inherently included lesser offense to murder, but it may be a factually included lesser offense if the charging instrument alleges that the killing was accomplished by a battery. *Evans v. State*, 727 N.E.2d 1072, 1081 (Ind. 2000). A factually included lesser offense exists when the charging instrument alleges that the means used to commit the charged crime include all of the elements of the alleged lesser included offense. *Wright*, 658 N.E.2d at 567.

10

Here, the charging Information stated that Petty "knowingly or intentionally" killed Keown. (Appellant's App. p. 35). Because the information did not assert a *battery*, involuntary manslaughter in this case was not a factually included lesser offense of murder. The trial court therefore did not err in refusing to give the instruction involuntary manslaughter. *See Wright*, 658 N.E.2d at 567.

### III. *Sufficiency of the Evidence*

Petty contends that the State failed to present sufficient evidence to sustain his conviction for voluntary manslaughter. Specifically, he contends the State failed to prove beyond a reasonable doubt that he intended to kill Keown when he strangled her.

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Agilera v. State*, 862 N.E.2d 298, 306 (Ind. Ct. App. 2007). We will consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id*. A conviction may be based upon circumstantial evidence alone. *Id*. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Abney v. State*, 822 N.E.2d 260, 264 (Ind. Ct. App. 2005).

A conviction of voluntary manslaughter requires proof that Petty intentionally or knowingly killed Keown while acting under sudden heat. I.C. § 35-42-1-3. "Sudden heat" is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and

11

rendering a person incapable of cool reflection. *Dearman v. State,* 743 N.E.2d 757, 760 (Ind. 2001).

Here, the evidence in favor of the judgment indicates that Petty knowingly or intentionally killed Keown while acting under sudden heat. Petty testified that he and Keown fought about the identity of the person that Keown had talked to on the night she died. Petty testified that after Keown refused to tell him who she was talking to, he became angry. When asked to rate his anger on a ten-point scale, Petty testified that he was a nine. Petty said that he was so angry that night that he was planning to kill whoever Keown had been talking to on the phone. Also, the record shows that Petty called Barger, who refused to identify himself. In his anger, Petty went back to the bedroom, got on top of a passed out Keown, and choked her. *See Erlewein v. State*, 775 N.E.2d 712, 715 (Ind. Ct. App. 2002) (where this court stated that choking someone for a minimum of forty-five seconds clearly evinces an intent to kill or, at the very least, an awareness of a high probability that death would result). Petty also admitted that he had a harder time controlling his thoughts and actions when angry. Moreover, Barger testified that when Petty called him on the night Keown was killed, Petty was really angry.

Based on the foregoing, we find that the evidence presented by the State permitted the jury to come to a reasonable conclusion that in a fit of anger brought first by Keown's defiance and then Barger's, Petty went to his bedroom and strangled Keown to death.

IV. *Inappropriate Sentence*

12

Lastly, Petty contends that the sentence imposed is inappropriate based on the nature of the offense and his character. [1] Indiana Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "Ultimately the length of the aggregate sentence and how it is to be served are the issues that matter." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Id.*

The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). A sentence for Class B felony ranges from a fixed term of between six and twenty years, with the advisory sentence being ten years. *See* I.C. § 35-50-2-5. Whereas a sentence for a Class D felony ranges from six months to three years, with an advisory sentence of one and a half years. *See* I.C. § 35-50-2-7(a). Here, the trial court sentenced Petty to an aggregate consecutive sentence of twenty years for voluntary manslaughter, enhanced by thirty years due to his habitual offender status; three years for removal of body from scene; and three years for obstruction of justice.

---

[1] Petty presents his sentencing argument as two issues. However issue IV is comprised of a single paragraph reciting the standard of review. In that paragraph, Petty alleges that the trial court abused its discretion by "maxing out" his sentence. (Appellant's Br. p. 7). We shall address his contention under this discussion.

In reviewing the nature of the crime, we note that Petty choked Keown and she died as a result. After he realized that Keown had died, Petty decided that he "didn't want to go to jail" and decided he would "try to just make it all disappear." (Tr. p. 1527). In the dead of the night, Petty loaded Keown's body on his 4-wheeler, drove to the countryside, and dumped her body in the woods, hoping it would never be found.

As, for Petty's character, he points out that he is a "moderate" offender. (Appellant's Br. p. 8). We disagree. Petty's extensive criminal history includes armed robbery, burglary, theft, battery, and domestic battery on Keown. In addition, Petty committed the instant offenses while on probation. Although Petty was enraged by Keown not telling him who she was talking to on her cellphone, that was no reason for him to take her life. Also, Petty's criminal history does not suggest that he has led a law abiding life and this fact negatively affects his character. Therefore, we find Petty's sentence is not inappropriate in light of the nature of the crimes and his character.

## CONCLUSION

Based on the foregoing, we find that: (1) the trial court did not abuse its discretion in admitting the photographs; (2) the trial court properly declined to instruct the jury on involuntary manslaughter; (3) there was sufficient evidence to support Petty's conviction for voluntary manslaughter; and (4) Petty's sentence is appropriate.

We affirm.

ROBB, J. and BRADFORD, J. concur