Brandon Tyler CUSTIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 11A01–0210–CR–420.

Court of Appeals of Indiana.

Aug. 26, 2003.

Susan K. Carpenter, Public Defender of Indiana, Gregory L. Lewis, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Brandon Tyler Custis was found guilty after a jury trial of murder,[1] attempted murder, a Class A felony,[2] and carrying a handgun without a license, a Class A misdemeanor.[3] The trial court sentenced him to concurrent presumptive sentences of fifty-five years for the murder, thirty years for the attempted murder, and one year for the handgun conviction. Custis raises two issues on appeal, which we restate as:

1. Whether the trial court erred by admitting an autopsy photograph of the victim's empty brain cavity to support the pathologist's conclusions about the trajectory of the bullet that killed the victim; and

2. Whether the trial court failed to properly balance aggravating and mitigating factors in sentencing Custis.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Custis knew that Anthony Vanet ("Tony") owed their mutual friend Orland Cyphers $300. On the evening of December 28, 2001, Custis was visiting some friends at the home of Colton Cooley in Poland, Indiana. Tony arrived at the home, he and Custis began to argue about the debt, and a scuffle ensued. By the time Cooley ordered the two men to leave, both a window and Custis' eyeglasses had been broken.

After leaving Cooley's house, Tony called his twin brother, Paul Vanet, who lived in Indianapolis. Tony falsely stated that six to eight men had jumped him at Cooley's house and requested Paul's help. Paul retrieved his 12 gauge shotgun, picked up his friend Bradley Hofmann,[4] and met Tony in Poland. The three men found Custis at Cooley's house around 10:00 p.m. Tony called for Custis to come out and fight, adding that Custis had crossed his path two times and the "third was going to be a charm." (State's Exhibit 29–A at 24.) Custis, who had consumed five to six Zimas[5] in less than an hour,

---

1. Ind.Code § 35–42–1–1(1).

2. Ind.Code § 35–41–1–1; Ind.Code § 35–42–1–1(1).

3. Ind.Code § 35–47–2–1. Custis was acquitted of receiving stolen property, a Class D felony. Ind.Code § 35–43–4–2(b).

4. In the record before us, Hofmann's name is spelled three different ways. Being unable to determine the correct spelling, we have selected one of the three.

5. The State, relying on testimony by a police officer, asserts in its Statement of the Facts that "Zima is a malt liquor with an alcohol content of 4.8% alcohol by volume, *which is roughly one and a half times the alcohol content of a 12–ounce bottle of beer.*" (Br. of Appellee at 2) (emphasis supplied). While we decline to reweigh the evidence before the trial court, we note that the State's assertion is incorrect.

According to Coors, the brewer of Zima, Zima's alcohol content is less than that of regular Coors beer. The Coors website indicates the alcohol level of Zima is 4.8% and that of Coors beer is 5.0%. *See http://www.coors.com/brews/nutrition.asp* (last

argued with Tony from the window before walking across the street to a bank parking lot to fight him.

As Custis, Tony, and their respective friends gathered in the parking lot, a van driven by two of Custis' cohorts, Cyphers and David McGuire, entered the parking lot and stopped near Paul. Paul retrieved a shotgun from his truck, pointed it at Cyphers' van, and told the men not to get out. Meanwhile, Tony punched Custis in the face and bloodied his lip. Neighbors heard the commotion and threatened to call the police. The group disbanded, and Tony and Custis agreed to finish the fight at a church parking lot a mile away.

Custis and his friend Ron Ingalls drove directly to the church parking lot and found the Vanets and Hofmann standing outside their truck. According to some, Paul was holding his shotgun. Custis had not brought a weapon but as he entered the church parking lot Ingalls handed him a .380 caliber handgun that Custis placed in his pocket. Custis then exited his vehicle and began arguing with Tony. At one point, the Vanets and Hofmann returned to their truck and started to leave but got only as far as the church entrance before Paul and Custis started to argue. Paul told Tony to get out of the truck and "kick [Custis'] ass" or Paul would kick Tony's when they got home. (Tr. at 570.) Tony,

Paul, and Hofmann got out of the truck and headed for Custis.

There was conflicting testimony as to what occurred next. Custis and another witness testified that Custis pulled out his pistol, waved it in the air, and told the Vanets to leave. Others testified that Custis shot his gun at Tony without warning. All witnesses agreed that after shooting Tony in the face, Custis fired four additional shots. One hit Paul in the arm. In response to Custis' shots, Paul fired his shotgun five times in Custis' general direction without hitting anyone. Tony's post-mortem toxicology reports revealed the presence of amphetamines and marijuana.

About twelve hours after the shooting, Custis turned himself in to police and was charged with the murder of Tony and the attempted murder of Paul and Hofmann. Custis admitted to police that he shot the men, but maintained he acted in self-defense and fired his gun only because Paul had a gun and the three men would not stop "chargin' at [him]." (Tr. at 823.)

At trial, the State offered an autopsy photograph of Tony's empty brain cavity. Custis objected on grounds the photograph was not relevant and its prejudicial impact on the jury would far outweigh its probative value, but the trial court admitted the photograph. At the conclusion of the trial

visited July 18, 2003). The alcohol level of other major beers is also 5.0% by volume, and therefore also higher than that of Zima. *See, e.g., http://www.mill erbrewing.com/brands-Breweries/nutrition.asp* (last visited July 18, 2003) (alcohol content of Miller High Life and Miller Genuine Draft is 5.0% by volume).

During Custis' trial, the State elicited from a police officer an affirmative answer to the question whether the alcohol content of Zima is "typically stronger than a regular beer that you would buy." (Tr. at 282.) It later elicited testimony from a forensic pathologist who was asked to "[a]ssume that there has been evidence that the defendant consumed a six

pack of Zima within several hours prior to the shooting. Could that have also caused a[sic] violent behavior on behalf of the defendant?" (Tr. at 698.) The pathologist testified

Zima has roughly one and a half times the alcoholic content of a, you know, regular type of beer ... [s]o given the assumption that this has one and a half times the alcohol content of a beer, six Zimas would be equivalent to approximately nine regular beers ... [s]o at this level, we would have continued to have a legally intoxicated level for at least four hours after the initiation. (*Id.* at 700–01.) Custis' counsel did not object to the testimony.

the court instructed the jury that it could return one of four verdicts on the murder count—not guilty, guilty of murder, or guilty of either of the two lesser included offenses of voluntary manslaughter or reckless homicide. Custis was convicted of murder, attempted murder, and carrying a handgun without a license.

## DISCUSSION AND DECISION

### 1. *The Autopsy Photograph*

Custis contends the trial court erred when it admitted into evidence over his objection Exhibit 74, an autopsy photograph showing Tony's empty brain cavity. The photograph was offered to support pathologist Dr. Roland Kohr's testimony that the trajectory of the lethal bullet was straight and that the victim had no defensive wounds. Characterizing the photograph as "inflammatory," (Br. of Defendant–Appellant at 8), Custis argues the photograph lacks relevance and its prejudicial impact on the jury far outweighs its probative value.

 To admit a photograph into evidence, a trial court must first determine the photograph is relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence R. 401. Evidence that is not relevant is not admissible. Evid. R. 402. Evidence that is relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Evid. R. 403. The relevance of photographs depicting the body of a victim is determined by whether a witness would be permitted to describe the scene photographed. *Kiefer v. State*, 239 Ind. 103, 113, 153 N.E.2d 899, 903 (1958).

 Our supreme court recently reiterated the standard of review for admission of photographic evidence:

> Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion. Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value.

*Corbett v. State*, 764 N.E.2d 622, 627 (Ind. 2002) (internal citations and quotation omitted). For its admission to amount to reversible error, a photograph must be irrelevant to an issue or its probative value must be substantially outweighed by the danger of unfair prejudice. Evid. R. 402; Evid. R. 403; *Bufkin v. State*, 700 N.E.2d 1147, 1149 (Ind.1998).

 Photographs that depict a victim's injuries are generally relevant and admissible. *Wallace v. State*, 725 N.E.2d 837, 839 (Ind.2000). However, the graphic portrayal of an autopsy by a photograph or photographs carries the potential for displaying more than the state of the victim's body at the time it was discovered. *Loy v. State*, 436 N.E.2d 1125, 1128 (Ind.1982). Autopsy photos often present a unique problem because the pathologist has manipulated the corpse in some way during the autopsy. *Allen v. State*, 686 N.E.2d 760, 776 (Ind.1997), *reh'g denied, cert. denied* 525 U.S. 1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999).

■ Autopsy photographs are generally inadmissible if they show the body in an altered condition. *Corbett,* 764 N.E.2d at 627. This is so because the photographs may impute to the accused the handiwork of the pathologist and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy. *Turben v. State,* 726 N.E.2d 1245, 1247 (Ind.2000).

Notwithstanding that general rule, there are situations where some alteration of the body is necessary to demonstrate the testimony being given. *Corbett,* 764 N.E.2d at 627; *and see Cutter v. State,* 725 N.E.2d 401, 406 (Ind.2000) (photograph of pathologist holding open a vagina to show bruises was properly admitted as relevant to show the "by force" element of the rape charge), *reh'g denied; Fentress v. State,* 702 N.E.2d 721, 722 (Ind.1998) (two photographs depicting the victim's skull with the hair pulled back were admissible because the pathologist explained the alteration was necessary to determine the extent of the victim's injuries).

In *Swingley v. State,* 739 N.E.2d 132 (Ind.2000), the defendant was convicted of murdering the victim by slashing his throat. At the State's request, the trial court admitted three autopsy photographs, two of which depicted the victim's gaping neck wound and one of which depicted the victim's windpipe or larynx removed from the body and lying on a sheet. On appeal, Swingley argued the trial court erred in admitting the photographs because the victim's body had been altered. Finding that the pathologist had done nothing to the body in the first two photographs other than clean the gaping wound and reposi-

tion the body, our supreme court held them properly admitted. *Id.* at 134.

In contrast, the court found the removed larynx to be the type of alteration that *Allen* contemplates. Noting that other evidence depicted the extent of the victim's wounds and the cause of death, the court held that the trial court erred in admitting the photograph of the larynx. *Id.; See also Turben,* 726 N.E.2d at 1247 (photograph inadmissible that depicted gloved hands manipulating with a probe a bloody mass representing victim's head with skin and bones cut open and peeled back to expose interior of victim's neck).

Here, outside the presence of the jury, the State proffered five photographs of Tony that were taken during the autopsy.[6] Exhibit 74 was an 8½ by 11–inch black and white photograph of Tony's head. It shows Tony's empty brain cavity with the top of his skull and his brain removed. The photographs also show the gloved hand of Dr. Kohr holding a ruler inside the brain cavity and pointing out the path of the bullet.

The State argued the photographs were relevant

on at least two aspects, especially in a self-defense issue which is, of course, an issue here. One being the path of the bullet and that leads secondly to the testimony about the relevance of defensive wounds or lack thereof. And Dr. Kohr testified that those photographs would help demonstrate that, so the relevance would be high. We've attempted to lessen the impact by submitting them as black and white photographs. And, Your Honor, I think also this would be extremely important when we have a trial based on self-defense which with

---

6. Of the more than sixty photographs entered into evidence by the State to depict the scene of the crime, the victims, and the evidence associated with the crime, the vast majority of the photographs were 4 by 6 inches and in color. The autopsy photograph at issue here was 8½ by 11 inches in size, but was black-and-white.

the conflicting testimony already about the defendant waiving [sic] a gun in the air versus an eye witness who saw them standing face to face. These two issues, the path of the bullet and the lack of defensive wounds, will be directly relevant on the heart of this case[.]

(Tr. at 665–66.) Custis argued:

The issue for the jury is not whether the firing of that weapon killed Tony Vanet. So to show this jury these exhibits, specifically 74 and 75, which I'll characterize as gruesome, grotesque, is highly inflammatory, is going to allow sympathy and prejudice in the jury against the defendant ... If the defendant was saying I didn't pull the trigger or I shot him from fifty feet away, or he didn't die because of my shot, they would be relevant, and I wouldn't be making this objection. But he is not doing any of those arguments. He's saying I fired the shot, that shot resulted in Tony's death; therefore, there is no probative value to putting these gruesome pictures into evidence.

(*Id.* at 662.)

We commend the trial court for its thorough evaluation of the probative value and prejudicial impact of the photographs in this case [7] and find the trial court did not abuse its discretion in admitting Exhibit 74. The photograph was relevant to show the trajectory of the bullet and whether Tony had defensive wounds. The State's theory was that Custis pulled a gun out of his pocket and shot Tony without warning. The straight trajectory of the bullet and the absence of defensive wounds to Tony is consistent with the State's theory. Under Evid. R. 401, the photograph did make a fact of consequence to the determination of

the case more or less probable than it would have been without the evidence.

While the photograph was of an autopsy, the danger of unfair prejudice was lessened because it was in black and white and the scene represented in the photograph was fully explained to the jury by Dr. Kohr. Dr. Kohr explained that the ruler in his gloved hand, pictured in the photograph, pointed to a darkened area showing the straight, front-to-back path of the bullet, which had no deviation left or right. In *Fentress*, 702 N.E.2d at 722, the pathologist explained to the jury in great detail that, in order to determine the extent of the damage to the victim's skull, he needed to look under the skin. The pathologist described to the jury the nature of the victim's injuries that he uncovered and the likely cause of those injuries. Our supreme court found the potential for confusion "minimal" because the pathologist "described the procedure and its outcome to the jury and the jury also had pictorial evidence of the victim prior to the procedure." *Id.* The trial court was therefore within its discretion in determining that the probative value of this evidence—to show the force of the blow which in turn bore on the intent to kill—outweighed its prejudicial effect. *Id.* We believe the *Fentress* reasoning requires the same result in the case before us. The trial court did not abuse its discretion in admitting Exhibit 74.

 Even if the trial court erred in admitting the photograph that error does not warrant reversal. An error in admitting evidence is harmless if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of a party. *Buchanan v. State*, 767 N.E.2d

---

**7.** The trial court was sensitive to the potential prejudicial impact of the photographs and ruled that only one black and white photo-

graph of the victim's brain cavity could be admitted.

967, 970 (Ind.2002). In Buchanan's prosecution for child molesting, the trial court erroneously admitted evidence in the form of an assortment of drawings, postcards depicting nude or semi-nude young girls, and a magazine containing nude photographs of women titled "Little Girls." *Id.* at 969. The drawings and photographs were not tied to Buchanan's relationship with the victim. The other evidence available to the jury for consideration included the victim's testimony, the statements of five adults that the victim told them essentially the same story, and Buchanan's statements to FBI agents that were consistent with the victim's testimony. Our supreme court found the erroneous admission of the drawings and photographs harmless: "Given the substantial quantity of incriminating evidence presented, particularly the defendant's confession, we find that the admission of the drawings and postcards did not affect the defendant's substantial rights and does not warrant reversal." *Id.* at 970.

Similarly, in *Swingley,* the court found harmless the erroneous admission of a photograph of the victim's windpipe or larynx removed from the body and lying on a sheet. The court found it "improbable that the gruesome slide had any significant impact on the jury's decision" where two men had seen Swingley commit the crime and four other people on separate occasions heard the defendant say he cut the victim's throat. 739 N.E.2d at 134. The admission of the slide therefore did not affect Swingley's substantial rights, and the error was disregarded as harmless. *Id.*

Admission of the autopsy photograph in the case before us did not affect Custis' substantial rights. Custis asserts the exhibit might have caused the jury to find him guilty of murder rather than finding him not guilty or finding him guilty of the lesser offense of voluntary manslaughter, because the jury might have "unfairly rejected the evidence of self-defense and sudden heat because it held him responsible for the cuts, incisions, and indignity of the autopsy." (Br. of Defendant–Appellant at 12.)

Dr. Kohr testified to the alterations he had made in the brain cavity in order to show the path of the bullet; the jury therefore could not have held Custis "responsible for the ... indignity of the autopsy." *Swingley,* 739 N.E.2d at 133. Further, as in *Buchanan* and *Swingley,* the substantial quantity of incriminating evidence presented indicates Custis' substantial rights were not affected by the admission of the autopsy photograph. The jury heard testimony that Custis and Tony fought a few hours before Tony was killed. The two argued again later that night before deciding to fight in the bank parking lot. They fought there for a short time before moving the fight to the church parking lot. After the group arrived at the church, Custis was given a gun and he concealed it in his pants. At one point, the Vanets started to leave the parking lot when Custis made a slashing motion across his throat and told Paul Vanet "I'm going to kill your brother. Your brother's dead." (Tr. at 488.) A number of witnesses testified that Custis did not show his concealed weapon or warn Tony before shooting him. Custis testified he knew Tony was unarmed but shot him anyway. Even if admission of the black-and-white autopsy photograph was error, it was harmless in light of the overwhelming evidence that Custis was guilty and that he was not acting in self-defense or sudden heat.

## 2. *Sentencing*

 Custis contends the trial court erred because it did not consider certain

mitigating circumstances that would have supported a lesser sentence. Sentencing lies within the discretion of the trial court. *Thacker v. State,* 709 N.E.2d 3, 9 (Ind.1999), *reh'g denied.* When a judge *increases* the presumptive sentence, the record must disclose what factors were considered mitigating and aggravating. *Harrington v. State,* 584 N.E.2d 558, 565 (Ind.1992), (emphasis supplied) *reh'g denied.* By contrast, when the trial court imposes the basic sentence prescribed by a particular criminal statute, compliance with the applicable sentencing statutes is presumed regardless of whether the record includes the trial court's specific enumeration of aggravating and mitigating factors. *Jones v. State,* 698 N.E.2d 289, 290 (Ind.1998).

The trial court sentenced Custis to a term of fifty-five years for murder, thirty years for attempted murder, and one year for carrying a handgun without a license. These were the presumptive sentences for each of those crimes and the sentences were to run concurrently. Because Custis received the presumptive sentence for each of his convictions and the sentences were not ordered served consecutively, we cannot say the trial court erred in failing to recognize the mitigating circumstances Custis offered.

### CONCLUSION

The trial court did not abuse its discretion in allowing into evidence a black-and-white autopsy photograph to supplement the pathologist's testimony, and its compliance with the applicable sentencing stat-utes is presumed because Custis received the presumptive sentences for all the crimes of which he was convicted. We accordingly affirm.

MATHIAS, J., concurs.

KIRSCH, J., dissenting with separate opinion.

KIRSCH, Judge, dissenting.

I respectfully dissent. I believe that the photograph at issue was not relevant and that its prejudicial effect greatly outweighed its probative value.

Here, outside the presence of the jury, the State proffered five photographs of the victim taken during the autopsy.[8] Exhibit 73 was an 8½ by 11–inch color photograph of the victim's face showing the entry wound made by the fatal bullet. Exhibits 74 and 75 were 8½ by 11–inch black and white photographs of the victim's head taken during the autopsy. The photographs revealed Tony's empty brain cavity with both the top of his skull and his brain removed. The photographs also reveal the gloved hand of Dr. Kohr holding a ruler inside the brain cavity and pointing out the path of the bullet. The photographs were printed in black and white at the suggestion of Dr. Kohr. Exhibits 74A and 75B were 8½ by 11–inch photographs depicting the same scenes as Exhibits 74 and 75, but were in color.[9] Custis did not object to the admission of the color photograph showing the bullet wound in the victim's face, but strongly objected to the admission of the photographs depicting the victim's empty brain cavity.

---

8. Of the more than sixty photographs entered into evidence by the State to depict the scene of the crime, the victims, and the evidence associated with the crime, the vast majority of the photographs were 4 by 6 inches in size. It is interesting to note that the autopsy photographs were 8½ by 11 inches in size.

9. Although Exhibits 74A and 75B are described in transcripts of the trial, the color photographs are not part of the record before us. The State withdrew the color exhibits of Tony's brain cavity after the trial court determined that they were inadmissible.

Out of the presence of the jury, John Fuhs, Custis's attorney, argued that the photographs were not relevant and questioned the pathologist as follows:

MR. FUHS: Dr. Kohr, do you understand that the defendant is going to admit and has admitted that the bullet that came from the handgun that struck Tony Vanet resulted in the death.

DR. KOHR: Yes, sir.

MR. FUHS: Had Mr. Thomas [the State's attorney] told you that?

DR. KOHR: No, he had not.

MR. FUHS: Okay. Well, if I tell you that the cause of death is not an issue in this case, and assume that's true, and assume Exhibit 73 which is a frontal view comes into evidence, you're going to testify that the wound to the cheek caused the death of Tony Vanet?

DR. KOHR: Yes, sir.

*Transcript* at 656. Apparently, Dr. Kohr was not told until the trial that Custis agreed with Dr. Kohr's opinion as to the cause of death. When asked how the photographs of Tony's brain cavity were relevant, Dr. Kohr stated that they showed the position the decedent was assuming at the time of the shooting, i.e., "whether he was trying to allude [sic] a shot or take it face on or whether he made any type of defensive posturing or movement." *Transcript* at 657.

Still outside the presence of the jury, Fuhs objected to the admission of the photographs as follows:

[T]he defendant has never asserted that he did not shoot Tony Vanet. In fact, he has maintained throughout the pretrial conferences, I think throughout my opening remarks and it's gonna [sic] be his testimony that he shot Tony Vanet. That the bullet which ... exited his handgun ... struck Tony Vanet. Exhibit 73, which is going to be shown to the jury, is going to show that the bullet entered Tony Vanet I believe in the right cheek area. Dr. Kohr, who did the autopsy, can certainly testify that that bullet wound was fatal, that that bullet wound caused the death of Tony Vanet. Mr. Custis does not dispute that. Mr. Custis says I was justified in firing that weapon. That's the issue for the jury. The issue for the jury is not whether the firing of that weapon killed Tony Vanet. So to show this jury these exhibits, specifically 74 and 75, which I'll characterize as gruesome, grotesque, is highly inflammatory, is going to allow sympathy and prejudice in the jury against the defendant. In these types of cases, the case law is clear that the court needs to balance the probative value of these pictures against the potential inflammatory nature and the prejudice to the defendant. If the defendant was saying I didn't pull the trigger or I shot him from fifty feet away, or he didn't die because of my shot, they would be relevant, and I wouldn't be making this objection. But he is not doing any of those arguments. He's saying I fired the shot, that shot resulted in Tony's death; therefore, there is no probative value to putting these gruesome pictures into evidence. I think the prejudice far outweighs any probative value in a case of this magnitude. Frankly, I don't know why Mr. Thomas, as an officer of the court, is offering them since we've conceded what the doctor's testimony is going to be on cause of death. We've conceded it was a straight-on shot. The evidence is going to be it was at close range.... I know the court has discretion in this regard and I know in some cases gory, gruesome photographs are proper.

*Transcript* at 661–63.

The State's argument that the photographs were relevant was as follows:

Your Honor, I believe [Exhibits 74 and 75] are relevant on at least two aspects, especially in a self-defense issue which is, of course, an issue here. One being the path of the bullet and that leads secondly to the testimony about the relevance of defensive wounds or lack thereof. And Dr. Kohr testified that those photographs would help demonstrate that, so the relevance would be high. We've attempted to lessen the impact by submitting them as black and white photographs. And, Your Honor, I think also this would be extremely important when we have a trial based on self-defense which with the conflicting testimony already about the defendant waiving a gun in the air versus an eye witness who saw them standing face to face. These two issues, the path of the bullet and the lack of defensive wounds, will be directly relevant on the heart of this case. . . .

*Transcript* at 665–66.

While I recognize that the trial court took care to evaluate the prejudicial impact of the photographs in this case, and I join the majority in commending the court for such care, I nevertheless believe that Exhibit 74 was not relevant under Ind. Evidence Rule 401 and that the trial court abused its discretion in admitting it. The State asserts that the photograph was relevant to show the trajectory of the bullet and whether Tony had defensive wounds. Although the parties disagreed about whether Custis took out his gun and waved it around before the shooting, both parties agreed that the actual shot that killed Tony was one that took the victim by surprise and was a straight shot to the face. Custis's theory was that the victim would not stop charging at him, and he had to shoot in self-defense. The State's theory was that Custis pulled a gun out of his pocket and shot Tony without warning. A straight shot, with no defensive wounds

to the victim, would be consistent with both of these theories. The photograph did not make any fact of consequence to the determination of the case more or less probable than it would have been without the evidence, and, thus, I believe it was irrelevant under Rule 401.

Even if relevant, Exhibit 74 should still have been excluded from trial because its probative value was substantially outweighed by the danger of unfair prejudice. Evid. R. 403. Exhibit 74 had very little, if any, probative value. Inspection of the photograph does not reveal how it could have contributed to the jury's understanding of the trajectory of the bullet or the existence of defensive wounds. After offering the photograph into evidence, Dr. Kohr admitted that it is "obviously difficult to orient unless you're familiar with neuro anatomy or skull anatomy." *Transcript* at 687. The jury had no such training. Dr. Kohr explained that the ruler in his gloved hand, pictured in the photograph, pointed to a darkened area showing the straight, front-to-back path of the bullet, which had no deviation left or right. The difficulty in orienting oneself to the inside of Tony's skull, plus the two-dimensional nature of the photograph, make it impossible to determine the trajectory of the bullet or the lack of defensive wounds. The debatable probative value, especially in light of the arguable lack of relevance, is substantially outweighed by the photograph's prejudicial nature. Thus I believe it was error to admit the photograph.

An error in the admission or exclusion of evidence may be disregarded unless the error affects the substantial rights of the parties. *Wilson v. State,* 770 N.E.2d 799, 802 (Ind.2002). Here, I cannot conclude that this is the case. The photograph was gruesome and the jury likely was impacted. Further, Custis requested, and, over

the State's objection, the trial court gave an instruction on the lesser-included offenses of murder, i.e., voluntary manslaughter and reckless homicide. From this it can be inferred that the trial court believed the evidence could have supported a conviction of one of the lesser-included offenses. *See Anderson v. State*, 681 N.E.2d 703, 709 (Ind.1997) (where a charge is an inherently included offense of murder, a requested instruction on that charge should always be given in a case in which murder has been charged if the evidence warrants it). Since the prejudicial effect of the photograph may have caused the jury to unfairly reject the evidence of self-defense or the evidence that Custis was guilty of only a lesser-included offense, I cannot say that the erroneous inclusion of the photograph did not substantially affect his rights.

I would reverse Custis' conviction and remand for a new trial.