**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 10 2014, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TED MUELLER, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A05-1305-CR-240 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Robert J. Pigman, Judge
Cause No. 82D02-1209-MR-1148

**June 10, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Ted A. Mueller, Jr. (Mueller), appeals his conviction for Count I, murder, Ind. Code § 35-42-1-1; and Count II, conspiracy to commit robbery, a Class C felony, I.C. §§ 35-41-5-2; 35-42-5-1.

We affirm.

## ISSUES

Mueller raises five issues on appeal, which we restate as the following four issues:

(1) Whether the trial court abused its discretion in admitting and excluding certain evidence;

(2) Whether the State failed to present sufficient evidence beyond a reasonable doubt to support Mueller's conviction for conspiracy to commit robbery;

(3) Whether the trial court abused its discretion in sentencing Mueller; and

(4) Whether Mueller's sentence is inappropriate.

## FACTS AND PROCEDURAL HISTORY

During the early morning hours of September 17, 2012, a twenty-four-year-old man from Henderson, Kentucky was murdered outside of an abandoned house in Evansville, Indiana. The events leading up to the fatal shooting of Cedric Watt (Watt) began the previous evening when Watt made plans to visit his friend, Shawn Kohlmeyer (Kohlmeyer). As neither Watt nor Kohlmeyer had a vehicle, Kohlmeyer contacted his friend, Mueller, and asked if he would be willing to drive to Henderson to pick Watt up

and bring him to Evansville. Kohlmeyer informed Mueller that, in exchange for the ride, Watt had offered to provide gas money and some marijuana.

At the time, Mueller was temporarily living with his sister, Angie Mueller (Angie), in an apartment located at 601 East Chandler Avenue in Evansville. Angie's boyfriend, Christopher Bell (Bell), and their two children also lived in the apartment, along with three other roommates. Mueller and Bell arranged to meet Kohlmeyer outside of his girlfriend's apartment, and they would drive to Henderson together. Bell also asked Kohlmeyer if he knew where Bell could obtain a gun, and Kohlmeyer stated that he did not. Following their conversation with Kohlmeyer, Mueller and Bell made several phone calls. In addition to calling a third party—supposedly Watt himself—to inquire about marijuana prices, Bell phoned Mueller's half-brother "to find more out about [Watt]." (Transcript p. 153). Mueller's half-brother articulated that Watt was "a bitch ass" and a "nigga." (Tr. pp. 173-74). Their roommate (who is Mueller's cousin), Dylan Knott (Knott), overheard as Mueller and Bell made these calls. According to Knott, it sounded as though Mueller and Bell were discussing plans to execute a robbery.

As Mueller and Bell were preparing to leave, Angie asked if she could accompany them. Driving Angie's minivan, Mueller picked up Kohlmeyer before crossing over the Ohio River into Kentucky. They arrived in Henderson after midnight, retrieved Watt, and immediately journeyed back to Evansville. Along the way, the four men smoked some of the "dro" (*i.e.*, marijuana) that Watt had procured from his supplier earlier that evening. (Tr. p. 368).

3

When they reached Evansville, Mueller drove to Timothy Rice's (Rice) house on New York Street. Angie and Watt waited in the minivan as Mueller, Bell, and Kohlmeyer spoke with Rice about whether he knew anyone who might want to purchase marijuana. Kohlmeyer waited on the porch while Mueller and Bell went inside the house with Rice for a few minutes. The three returned to the minivan, and Mueller drove to a house on Denby Avenue. There, Bell told Watt to measure out "a few grams of weed." (Tr. p. 404). Watt weighed and packaged the marijuana and accompanied Mueller and Bell to the house. Watt returned a few minutes later, telling Kohlmeyer that the buyer "wanted to see it on the scales." (Tr. p. 405). Watt then stated that "something didn't feel right" and asked Kohlmeyer to take the scales inside for him, but Mueller and Bell had already returned to the vehicle. (Tr. p. 405).

By this time, it was nearly 3:00 AM on September 17, 2012, and Mueller and Bell agreed to drive Kohlmeyer and Watt to Kohlmeyer's girlfriend's apartment. Mueller parked near a vacant property on Delaware Street, approximately one block away from the girlfriend's home. Although the precise details are indeterminate, it is apparent that a scuffle ensued after the men exited the vehicle. Mueller suddenly withdrew a heretofore concealed gun from his waistband and aimed it at Watt. When Watt took off running, Bell instructed Mueller to "shoot" and Mueller pulled the trigger. (Tr. p. 78). After Watt fell to the ground, Mueller used the gun to strike Watt's head.

Residents on Delaware Street heard the gunshot. The sound woke Mercedes Jackson, who looked out her window to see "[a] light colored van speed off and a white male running down the alley." (Tr. p. 291). When Ronald (Ronald) and Rebecca

4

(Rebecca) Motteler heard the gunshot, Rebecca went to her window and observed the silhouettes of four individuals huddled together on the sidewalk. She heard laughing and someone with a "higher pitched voice" say, "[S]erves you right for ripping me off." (Tr. p. 266). Rebecca also witnessed as "the most slender one of the four" individuals pulled Watt's pants down. (Tr. p. 266). The group drove off, and Rebecca called the police. Ronald went outside to find Watt face down on the ground, with his pants pulled down to expose his buttocks. Watt had lacerations on his face and hand, and there was an apparent bullet hole in his back. Although Ronald initially heard "death rattle" breathing, he was unable to detect Watt's pulse. (Tr. p. 202). While investigating the crime scene, detectives discovered a small bag of marijuana clutched in Watt's hand.

Following the shooting, Kohlmeyer had fled on foot through an alley to his girlfriend's apartment. When Mueller, Bell, and Angie returned to their apartment, they were frantic. Mueller and Bell poured bleach over their clothing and destroyed their cell phones. They then dumped everything in various alleys.

Having retrieved information from Watt's cell phone, the police took Kohlmeyer into custody later that same morning. The police arrested Mueller and Bell on September 20, 2014. Bell waived his *Miranda* rights and identified Mueller as Watt's killer. Bell also claimed that Mueller had tossed the gun out of the minivan's window either near a bakery or into a creek. Police searched both areas, but the gun was never recovered. On September 21, 2012, the State filed an Information, charging Mueller with Count I, murder, I.C. § 35-42-1-1(1); and Count II, conspiracy to commit robbery resulting in serious bodily injury, a Class A felony, I.C. §§ 35-41-5-2; 35-42-5-1(1).

5

A four-day jury trial commenced on March 11, 2013. During the trial, the pathologist who performed Watt's autopsy testified that Watt died as the result of "a gunshot wound to the heart." (Tr. p. 226). Although several witnesses testified that Mueller shot Watt in the back, the autopsy revealed that the bullet entered Watt's chest, went directly through his heart, and exited from his lower back. When the State rested its case-in-chief, Mueller moved for a directed verdict on the conspiracy charge, which the trial court denied. At the close of the evidence on March 14, 2013, the jury found Mueller guilty as charged.[1] On April 16, 2013, the trial court held a sentencing hearing and entered a judgment of conviction for both Counts, but it reduced the conspiracy charge to a Class C felony on double jeopardy grounds. Thereafter, the trial court sentenced Mueller to serve sixty years for murder and five years for conspiracy to commit robbery in the Indiana Department of Correction. The trial court ordered that Mueller's sentences run consecutively for an aggregate term of sixty-five years.

Mueller now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Evidentiary Rulings*

Mueller first claims that the trial court abused its discretion by admitting three "highly prejudicial" photographs into evidence and by excluding evidence of his co-conspirator's pending criminal charges. (Appellant's Br. p. 8). The admissibility of

---

[1] In August of 2013, Bell was convicted of murder and conspiracy to commit robbery and was sentenced to ninety years and six years, respectively. Our court issued a memorandum decision upholding his conviction. *Bell v. State*, No. 82A04-1309-CR-478 (Ind. Ct. App. May 23, 2014).

evidence is a matter within the sound discretion of the trial court. *Jackson v. State*, 973 N.E.2d 1123, 1127 (Ind. Ct. App. 2012), *trans. denied*. We review the trial court's evidentiary rulings for an abuse of discretion. *Id.* It is an abuse of discretion if "the trial court's decision is clearly against the logic and effects of the facts and circumstances before it." *Id.*

In general, evidence is admissible if it is relevant—that is, if it tends to make the existence of any consequential fact more or less probable. Ind. Evidence Rules 401-402. The trial court may, however, exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *Corbett v. State*, 764 N.E.2d 622, 627 (Ind. 2002). Any "[e]rrors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party." *Swingley v. State*, 739 N.E.2d 132, 134 (Ind. 2000). In determining whether an error is harmless, we "must assess the probable impact of that evidence upon the jury." *Id.*

### A. *Photographs*

Mueller challenges the admission of one photograph taken during Watt's autopsy, which depicts the heart torn open inside of his chest cavity (State's Exhibit 49), and two photographs taken during Watt's life, one of which is a portrait of Watt from the chest up (State's Exhibit 56) and the other is his Kentucky identification card (State's Exhibit 120). As an initial matter, Mueller concedes that he did not object to the admission of any of the three photographs during the trial. "To preserve an issue regarding the admission of evidence for appeal, the complaining party must have made a contemporaneous objection to the introduction of the evidence at trial." *Oldham v. State*, 779 N.E.2d 1162, 1170 (Ind.

7

Ct. App. 2002), *trans. denied*. The failure to object waives the issue for our review. *Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013). Nevertheless, Mueller maintains that our court may properly hear his claim because the admission of the photographs, both individually and cumulatively, amounts to fundamental error.

The fundamental error doctrine is an extremely narrow exception to "the general rule that the failure to object at trial constitutes procedural default precluding consideration of the issue on appeal." *Id.* The fundamental error doctrine serves to rectify "egregious" errors; thus, it "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.* (quoting *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)). The alleged error "must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." *Id.* (quoting *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010)).

We first note that Mueller did more than merely fail to object to the admission of the photographs during the trial. On February 26, 2013, during a pre-trial evidentiary hearing, Mueller, via his attorney, informed the trial court and the State that he had no objections to the photographs "based on gruesomeness or anything like that." (Pre-Trial Hearing Tr. p. 13). Then, during another hearing on March 8, 2013, Mueller requested that the trial court ask questions during *voir dire* about the potential jurors' "ability to handle graphic photographs." (Tr. p. 5). Mueller clarified that his sole concern was ensuring the jurors were equipped to view the images because "almost every photograph . . . is relevant and admissible and . . . I'm not even going to object to anything with regard to

8

photographs." (Tr. p. 8). Finally, when the State admitted photographs of the "property that was located during the autopsy" into evidence, which included Watt's identification card, Mueller "agree[d] [that] they should be admitted." (Tr. pp. 548-49). *See Halliburton*, 1 N.E.3d at 679 ("'The appellant cannot on the one hand state at trial that he has no objection to the admission of evidence and thereafter in this [c]ourt claim such admission to be erroneous.'" (quoting *Harrison v. State*, 281 N.E.2d 98, 100 (Ind. 1972))). The fundamental error doctrine presupposes that the trial court erred in its admissibility ruling. *Id.* Here, Mueller repeatedly informed the trial court that he had no objections to the photographs. Because the trial court was not obligated to overrule their admission *sua sponte*, we find no "egregious" error to warrant invoking the fundamental error doctrine. *See id.*

Moreover, we find Mueller's fundamental error arguments to be unpersuasive. Mueller insists that "[t]he admission of highly prejudicial photographs implicate[s] [his] fundamental rights." (Appellant's Br. p. 14). To this end, he asserts that the State's Exhibit 49 is "gruesome and highly prejudicial[,]" and "the jury may have blamed Mueller for the grotesque state of Watt's body." (Appellant's Br. p. 16). Likewise, he contends that the State's Exhibits 56 and 120 are irrelevant and "highly prejudicial." (Appellant's Br. p. 18). We will address each photograph in turn.

### 1. *State's Exhibit 49—The Autopsy Photograph*

An autopsy photograph that depicts "the body in an altered condition" is generally inadmissible. *Custis v. State*, 793 N.E.2d 1220, 1225 (Ind. Ct. App. 2003), *trans. denied*. However, there are exceptions if "some alteration of the body is necessary to demonstrate

9

the testimony being given." *Id.* In the case at hand, the pathologist relied on the State's Exhibit 49 during his testimony to explain the cause of Watt's death. *See Swingley*, 739 N.E.2d at 134 (finding the probative value of an autopsy photograph in which the pathologist "had opened the wound to show the blood vessels that had been cut (resulting in death)" outweighed its prejudicial effect). Several witnesses testified that Watt was shot in the back, so the pathologist used Exhibit 49 to describe the trajectory of the bullet, which actually entered Watt's chest. Furthermore, because the jury viewed the photographs taken at the crime scene depicting the entrance and exit wounds on Watt's unaltered body, and the pathologist explained that *he* had opened the chest cavity, we find it unlikely that the jury imputed the pathologist's cuts and manipulation of Watt's body to Mueller. *See Fentress v. State*, 702 N.E.2d 721, 722 (Ind. 1998). Accordingly, we find no error, let alone fundamental error, in the admission of the State's Exhibit 49.

2. *State's Exhibits 56 and 120—Photographs Preceding Watt's Death*

Mueller challenges the relevance of Watt's identification card and his portrait because Watt's identity was not at issue during the trial. The State contends that the photographs are relevant to show that Watt was alive before Mueller murdered him. We find that the State's Exhibit 56 is only marginally relevant because all of the witnesses agreed that Watt was alive prior to the night in question. *See Pittman v. State*, 885 N.E.2d 1246, 1256 (Ind. 2008). Because this evidence is merely cumulative, however, any error is deemed harmless. *Kilpatrick v. State*, 746 N.E.2d 52, 58 (Ind. 2001). We find that the State's Exhibit 120 is relevant. A contested issue at trial was whether Mueller had, in fact, taken any property from Watt. The State's Exhibit 120 evidences one of the items found

10

during Watt's autopsy and could give rise to an inference regarding the absence of other personal property.

Mueller also contends that the photographs are highly prejudicial because "[t]he natural inclination when viewing such a photo is to feel deep sympathy for Watt's father over his pain and loss." (Appellant's Br. p. 18). While we recognize that the "perpetrators of such acts are not entitled to have their deeds completely sanitized when evidence is submitted to a jury[,]" we find that the juxtaposition of the photographs of Watt as a healthy young adult with the pictures of his slain body could have elicited an emotional response from the jury. *Shelton v. State*, 490 N.E.2d 738, 743 (Ind. 1986). Nevertheless, we find that any resulting prejudice from the admission of the State's Exhibits 56 and 120 did not inhibit Mueller's right to a fair trial or due process. *See Pittman*, 885 N.E.2d at 1256. Based on the testimony from three eyewitnesses that Mueller shot Watt, along with the evidence describing Mueller's conduct before and after Watt's murder, we find it improbable that the admission of the State's Exhibits 56 and 120 impacted the jury's verdict. Accordingly, any error would be harmless and not fundamental.[2]

## B. *Pending Charges of Witness/Co-Conspirator*

Mueller argues that the trial court violated his Sixth Amendment right to confront the witnesses against him by excluding evidence of Bell's pending criminal charges. Pursuant to Indiana Evidence Rule 609, evidence of prior criminal convictions is admissible, subject to certain limitations, to impeach a witness' credibility. Charges that

---

[2] Finding no error in the admission of any single photograph, we do not address Mueller's cumulative error argument.

11

have not been reduced to convictions are generally not admissible to impeach a witness. *Becker v. State*, 695 N.E.2d 968, 973 (Ind. Ct. App. 1998).

In this case, the trial court permitted Mueller to introduce evidence of Bell's pending charges for murder and conspiracy to commit robbery, which arose from the same underlying events as Mueller's case. However, the trial court denied admission of Bell's convictions and pending charges in ten other cases. Mueller now claims that the trial court abused its discretion by excluding the pending charges in two of those cases, which include failure to appear, burglary, theft, and habitual offender charges. By excluding evidence of Bell's pending charges, Mueller maintains that the trial court precluded him from "prob[ing] Bell's involvement in the murder and [] expos[ing] why he would want to implicate Mueller during his testimony." (Appellant's Br. p. 23).

"[O]ne of the fundamental rights of our criminal justice system" is the right to cross-examine witnesses pursuant to the Sixth Amendment to the United States Constitution. *Smith v. State*, 721 N.E.2d 213, 218-19 (Ind. 1999). The right of cross-examination is realized if the defendant has an opportunity to elicit matters such as a witness' bias. *Jarrell v. State*, 852 N.E.2d 1022, 1027 (Ind. Ct. App. 2006). The Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). A violation of this right will not warrant a new trial where the error is harmless. *Smith*, 721 N.E.2d at 219. In order to ascertain whether an error is harmless, courts consider numerous factors, "including the strength of the prosecution's case, and the importance of the witness' testimony, whether the testimony

was corroborated, the cross-examination that did occur, and whether the witness' testimony was repetitive." *Id.*

Evidence Rule 609 precludes impeachment of a witness with evidence of pending charges, but "[t]he questioning of witness bias presents a different set of issues, and pending charges that are the basis of an arrangement with the witness are a proper subject of cross-examination." *Id.* Mueller relies on *Smith v. State*, 721 N.E.2d at 219, where our supreme court held it was an abuse of discretion for the trial court to prohibit the defendant from questioning a witness "about her pending charges and any possible bias." The *Smith* court also found that it exceeded harmless error for the trial court to deny the defendant the right to question another witness about his pending charges and his arrangement with the prosecutor. *Id.* at 220. We find *Smith* to be sufficiently distinct from the present case.

Here, Mueller's examination of Bell was direct, not cross, examination. Outside of the jury's presence, Mueller requested permission of the trial court to question Bell about his pending criminal charges. At that time, the State verified that "[t]here is not and there has not been" any agreement in exchange for Bell's testimony. (Tr. p. 780). *See Smith*, 721 N.E.2d at 219. The trial court ruled that Mueller was limited to asking Bell about his charges as the co-conspirator and informed him that he could "question [Bell] as to whether he anticipates receiving some sort of favor or preferential treatment as a result of his testimony." (Tr. p. 781). Thus, unlike in *Smith*, the trial court did not cut off "*all inquiry into the possibility*" of Bell's biases. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In fact, Mueller chose not to question Bell about whether he was receiving any benefit from the State for testifying. Also, the trial court permitted evidence of Bell's pending charges

13

related to the instant case, noting that Mueller had "made [his] point that [Bell is] facing very serious charges himself so I think that impeachment has been accomplished." (Tr. p. 779). It is well settled that trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination[,]" and we find it was well within the discretion of the trial court to curtail admission of the pending charges. *Van Arsdall*, 475 U.S. at 679.

Moreover, even if the trial court had erred in refusing to admit Bell's other pending charges, we would find it to be harmless error. Bell's testimony was inconsistent and contradicted that of the other witnesses, and it is clear that the jury did not rely upon his statements in reaching its verdict. Accordingly, we conclude the trial court did not abuse its discretion by excluding evidence of Bell's additional pending charges.

## II. *Sufficiency of Evidence for Conspiracy to Commit Robbery*

Mueller claims that there is insufficient evidence to uphold his conviction for conspiracy to commit robbery, a Class C felony. When reviewing the sufficiency of the evidence to support a conviction, we do not reweigh evidence or assess the credibility of witnesses. *Drakulich v. State*, 877 N.E.2d 525, 531 (Ind. Ct. App. 2007), *trans. denied*. We will consider only the evidence most favorable to the verdict, along with any reasonable inferences derived therefrom. *Id.* We will affirm a conviction where "evidence of probative value exists from which a jury could find the defendant guilty beyond a reasonable doubt." *Fry v. State*, 748 N.E.2d 369, 373 (Ind. 2001).

In Indiana, an individual is guilty of robbery if he "knowingly or intentionally takes property from another person or from the presence of another person . . . by using or

14

threatening the use of force on any person." I.C. § 35-42-5-1(1). To support Mueller's conviction on a conspiracy basis, the State had to prove that Mueller, with the intent to commit robbery, agreed with another person to commit the robbery and that either Mueller or Bell "performed an overt act in furtherance of the agreement." I.C. § 35-41-5-2. Evidence of an express agreement is not required; rather, "'[i]t is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense.'" *Drakulich*, 877 N.E.2d at 531-32 (quoting *Porter v. State*, 715 N.E.2d 868, 870-71 (Ind. 1999)). The agreement may be established through "either direct or circumstantial evidence, including the acts of the parties to the agreement." *Id.* at 532. Evidence that the defendant is merely associated with the co-conspirator, without more, is insufficient to prove conspiracy. *Id.*

Mueller argues that there is insufficient evidence of an agreement with Bell to uphold his conspiracy conviction. We disagree. The evidence most favorable to the jury's verdict establishes that Knott overheard Mueller and Bell make plans to rob Watt of his marijuana. In furtherance of this objective, Mueller and Bell called a third party, purportedly Watt, to ask about marijuana prices and also called Mueller's half-brother to gather information about Watt. Kohlmeyer testified that Watt had fifteen grams—or "half an ounce"—of marijuana, which had a street value of "[a]round $300." (Tr. pp. 396-97). Based on Knott's testimony that Mueller and Bell asked about the price of "a half ounce" of marijuana, it is apparent that they were aware of the quantity in Watt's possession before they left their apartment that night. (Tr. p. 154).

15

During the trial, Angie testified that Mueller and Bell obtained the gun when they stopped at Rice's house shortly before Watt's murder. When Mueller parked the minivan in front of an abandoned property on the dimly-lit Delaware Street, Watt tried to walk away; there is no evidence that he threatened or otherwise provoked Mueller before Mueller withdrew the gun and aimed it at Watt. Thus, considering all of the other evidence, it was reasonable for the jury to infer that Mueller and Bell acquired the gun in order to ensure that Watt would give them the marijuana. The fact that several witnesses testified that Bell directed Mueller to "shoot" supports the finding that Mueller and Bell had an agreement to rob Watt. (Tr. p. 78). *See Forney v. State*, 742 N.E.2d 934, 937-38 (Ind. 2001) (noting that the jury had reasonably found that a co-conspirator's "instruction to 'get the money'" "was uttered in furtherance of [a robbery] agreement"). Angie's testimony that, following the shooting, Mueller explained that "[i]t wasn't supposed to happen like that" is also indicative of a pre-arranged robbery plan. (Tr. p. 84).

While there is evidence to contradict the finding of a conspiracy, including testimony that Knott did not actually hear Mueller and Bell devising a robbery plan and testimony that Mueller and Bell never agreed to obtain a gun and steal Watt's drugs, it is not the role of this court to reweigh the evidence. *See Boyce v.* State, 736 N.E.2d 1206, 1208 (Ind. 2000). Witnesses presented drastically different versions of how the events unfolded that night, and we defer to the jury's determination of credibility. Because the record contains sufficient evidence and reasonable resulting inferences of an agreement between Mueller and Bell, we affirm Mueller's conviction of conspiracy to commit robbery, a Class C felony.

16

III. *Abuse of Sentencing Discretion*

Mueller next claims that the trial court abused its discretion in sentencing him to serve sixty-five years. "[S]entencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*. We will find an abuse of discretion where "the decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* The trial court may abuse its discretion by failing to enter a sentencing statement, identifying aggravating and mitigating factors that are unsupported by the record, failing to consider circumstances that are clearly supported by the record, or by citing reasons that "are improper as a matter of law." *Id.* at 490-91. An abuse of discretion cannot be based upon the trial court's determination of the weight to be accorded to the various factors. *Id.* at 491.

In Mueller's case, the trial court imposed a sixty-year sentence for murder and a five-year sentence for conspiracy to commit robbery. Both of these sentences are authorized by statute. *See* I.C. § 35-50-2-3(a) (requiring a fixed term of forty-five to sixty-five years for murder, with the advisory sentence being fifty-five years); I.C. § 35-50-2-6(a) (requiring a fixed term of two to eight years for a Class C felony, with the advisory sentence being four years). In making its decision, the trial court stated:

> There was absolutely no reason for this to have happened. The time [Watt] was murdered he was not doing anything to [Mueller]. He was no threat to [Mueller]. He had not been any threat to [Mueller]. He had done nothing that evening to cause [Mueller] any problem. At the time he was murdered he was running from [Mueller]. [Mueller] shot him in the back. All he was

17

trying to do was get away from [Mueller's] display of deadly force. I find that aggravating. There's no explanation that makes any sense here as to why [Mueller] would feel it necessary to shoot this young man in the back as he was running away from [Mueller]. All he wanted to do was leave the scene. So the nature and circumstances . . . of the crime are aggravated. Also it was committed in the course of a deliberately planned conspiracy to rob [Watt] of his property. It was not something that happened on the spur of the moment. This is not something of a brief instant of misjudgment or youthful indiscretion. This was a preplanned deliberate crime that [Mueller] and [Bell] agreed to commit here. [Mueller's] criminal record is an aggravating circumstance though not as extensive as some the [c]ourt has seen. It does contain a number of convictions including prior felony convictions that are of concern to the [c]ourt. [Mueller has] a not insignificant juvenile record also. On a number of occasions [he has] failed either community corrections program of some kind that had provided [Mueller] with an opportunity to set [his] life straight and [he] didn't follow through with that. The [c]ourt feels that a sentence—I agree with the [State]. A sentence above the standard sentence is called for in this case.

(Tr. pp. 943-45). Mueller claims that the trial court abused its discretion because it should not have considered that Mueller preplanned the robbery or his juvenile history as aggravating factors, and it failed to take Mueller's expression of remorse into account as a mitigating circumstance.

A. *Improper Aggravating Factors*

Mueller asserts that the trial court improperly considered the preplanning of his crime as an aggravating factor because it is a material element of one of his convicted offenses. The Indiana Supreme Court has determined that "[a] factor constituting a material element of a crime cannot be considered an aggravating circumstance in determining [the] sentence." *Johnson v. State*, 687 N.E.2d 345 (Ind. 1997). Although we agree with Mueller that the trial court should not have considered the *agreement* between Mueller and Bell because it is an element of the conspiracy charge, it would not have been

18

improper for the trial court to consider Mueller's planning and preparation as an aggravating factor. *See Taylor v. State*, 695 N.E.2d 117, 119-20 (Ind. 1998). Furthermore, because the trial court made a separate statement when it ordered Mueller's five-year sentence for conspiracy, citing his criminal record and the nature and circumstances of the crime as warranting the enhancement, it appears that the trial court's reference to Mueller's agreement with Bell related solely to Mueller's murder sentence.

Nevertheless, only one valid aggravating circumstance is necessary to support an enhanced sentence. *Sargent v. State*, 875 N.E.2d 762, 769 (Ind. Ct. App. 2009). Even if one aggravating factor is found to be improper, the enhancement may be upheld if there is another valid aggravating circumstance. *Id.* Our courts have long found the seriousness of the offense, "which implicitly includes the nature and circumstances of the crime as well as the manner in which the crime is committed," to be a valid aggravating factor. *Anglemyer*, 868 N.E.2d at 492. In Mueller's case, we find that the trial court properly identified the seriousness of his offense as an aggravating factor to justify enhancing both sentences.[3]

### B. *Omitted Mitigating Factor*

Mueller also asserts that the trial court failed to consider his expression of remorse as a mitigating factor. The trial court is vested with the sound discretion to determine whether a factor is mitigating, and the trial court is under no obligation to explain its rationale for declining to find a proffered factor as mitigating. *Stout v. State*, 834 N.E.2d

---

[3] Because we find the trial court identified at least one valid aggravating factor, we need not address Mueller's argument that the trial court improperly considered his juvenile history.

707, 710 (Ind. Ct. App. 2005), *trans. denied*. Our supreme court has determined that a trial court's assessment of a defendant's remorse is subject to the same standard as a credibility determination. *Pickens v. State*, 767 N.E.2d 530, 535 (Ind. 2002). Absent evidence of the trial court's "impermissible consideration" of a factor, we will adopt its credibility determinations. *Id.* at 534-35.

In alleging that the trial court failed to find his expression of remorse as a mitigating factor, Mueller must "establish that the mitigating evidence is both significant and clearly supported by the record." *Anglemyer*, 868 N.E.2d at 493. Mueller cites his declaration immediately following the murder that it was an accident, along with his sentencing statements, to argue that his remorse is supported by "overwhelming evidence." (Appellant's Br. p. 33). Prior to his sentencing hearing, Mueller wrote a letter to the trial court, in which he expressed, in part:

> I am trul[]y sorry for what happened to [Watt,] and I feel [] for his family's loss. . . . [A] mistake was made that wasn't suppose[d] to happen. I'm sorry for what happened to [Watt] and I know that don't bring him back but it's true.

(Appellant's App. pp. 66-67). In addition, Mueller stated at the hearing, "I just want to say that I'm sorry for what happened. I'm not a bad person. Mistakes were made. I wish everything was different but it happened. I'm sorry and that's it." (Tr. p. 931). Even though the trial court did not identify any mitigating factors, it twice stated during the sentencing hearing that it had reviewed Mueller's letter. Thus, the trial court clearly considered Mueller's expression of remorse and acted within its discretion to reject it as a

significant mitigating factor. *See Amalfitano v. State*, 956 N.E.2d 208, 212 (Ind. Ct. App. 2011), *trans. denied*.

## IV. *Appropriateness of Sentence*

Finally, Mueller claims that his sixty-five year sentence is inappropriate in light of his character and the nature of the offense. Pursuant to Appellate Rule 7(B), our court "may revise a sentence authorized by statute" upon our finding "that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The purpose of our sentence review "is not to determine 'whether another sentence is more appropriate' but rather 'whether the sentence imposed is inappropriate.'" *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). We are mindful of the deference owed to the trial court in sentencing matters. Thus, "our principal role is to 'leaven the outliers' rather than necessarily achieve what is perceived as the 'correct' result." *Id.* (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The defendant bears the burden of persuading our court that his sentence is inappropriate. *Id.*

The nature of the instant offense is that Mueller shot a man who was trying to run away and subsequently hit him in the head with the gun. Along with his co-conspirator, Mueller sought out information regarding Watt's drug supply and Watt's character. After picking Watt up in Henderson, Mueller and Bell drove around for several hours, smoking Watt's marijuana and having him package it to sell to their acquaintances. Watt was waiting in the minivan as Mueller and Bell procured a gun, and he was simply trying to leave with Kohlmeyer when Mueller ambushed him. When Watt ran, Mueller shot him in the back (although the bullet entered Watt's chest based on the way he turned). After

21

shooting Watt, Mueller fled. He attempted to eliminate the traces of his guilt by discarding the gun, pouring bleach on his clothing, smashing his cell phone, and dumping the clothes and cell phone pieces in random alleys. Without any provocation, Mueller murdered the friend of his friend over marijuana.

As to the character of the offender, Mueller dropped out of high school in the tenth grade but later obtained his GED. He began consuming alcohol at age ten and was drinking heavily in the months preceding his arrest. Mueller also began using drugs at age twelve. In addition to smoking approximately half of an ounce of marijuana per day, Mueller also used ecstasy and Xanax on a regular basis.

Mueller's substance abuse problems are reflected in his significant criminal history. As an adult, he has been convicted of two Class D felonies, one for possession of a controlled substance and the other for intimidation. His criminal resume also includes misdemeanor convictions for public intoxication, possession of marijuana, illegal consumption of an alcoholic beverage, carrying a handgun without a license, and false informing. Mueller's hefty juvenile history consists of two Class C felonies, one for criminal recklessness after he shot a firearm into a gathering place, and the other for burglary. His juvenile misdemeanor offenses include operating a vehicle while intoxicated, public intoxication (twice), two Counts of battery resulting in bodily injury, resisting law enforcement, and disorderly conduct. Several of Mueller's offenses were committed while he was on probation for another crime, and his participation in the Alcohol Abuse Probation Services was revoked.

22

Although the instant offense is his most serious, Mueller's propensity for violence and his disregard for the laws relating to firearms began at an early age. Despite Mueller's numerous drug and alcohol-related arrests and incarcerations, it is clear that he does not appreciate the deleterious effects of his substance abuse. He rejected several opportunities to straighten out his life; instead, he became so consumed by his drug use that he killed another human being in order to acquire what is, for him, only a one-day supply of marijuana. We therefore find that Mueller's sentence is appropriate in light of his character and the nature of this offense.

CONCLUSION

Based on the foregoing, we conclude that the trial court did not commit fundamental error in its evidentiary rulings; there is sufficient evidence to uphold Mueller's conviction for conspiracy to commit robbery; the trial court did not abuse its sentencing discretion; and Mueller's sentence is appropriate.

Affirmed.

ROBB, J. and BRADFORD, J. concur